**In re CONTEMNOR CARON.**

Court of Common Pleas of Ohio,
Franklin County,
Domestic Relations and Juvenile Divisions.

Nos. 92DR–04–2101 and 99DP–04–427.

Decided April 27, 2000.

60

64

66

68

70

*Andrea R. Yagoda,* for relator.

*Douglas B. Dougherty,* for respondent-contemnor.

WILLIAM F. CHINNOCK, Judge.

### Background of Case

This is a case ("*Caron IV*") of indirect civil and criminal contempt of court. This opinion addresses the issue of contempt of court for child non-support in the consolidated domestic relations/parentage cases of Dennis T. Caron (the "father").

This marathon litigation began in April 1992, when the father of a then one-year-old boy filed a divorce action after one year of marriage and began a crusade to capture custody of his son. Throughout the life of the case, which before these post-decree proceedings lasted seven years until April 1999, when the Ohio

Supreme Court dismissed the father's appeal, the father unsuccessfully litigated the issue of custody in the trial court, the court of appeals, and the Ohio Supreme Court. The mother was awarded custody in all rulings. Throughout the protracted proceedings, the father filed numerous tangent state and federal lawsuits against a multitude of persons, including attorneys and judges on the case. The father generated numerous affidavits of prejudice and disciplinary complaints against the five trial court judges who have presided over the case, including the author of this opinion. A review of the court journal reveals that the father's activities generated over 1,000 entries, causing both parties to incur many tens of thousands of dollars in legal fees. Custody remains in the mother.

■ Upon dismissal of the domestic relations action by the Ohio Supreme Court in April 1999, affirming denial of custody to the father, he immediately filed a parentage action by which he attempts to disestablish his paternity and avoid his child support obligation of the now nine-year-old boy, despite the fact he acknowledged his legal status as father of the child more than a dozen times in the record of the domestic relations case. An order to show cause regarding civil and criminal contempt for non-payment of child support is before the court in these intertwined domestic relations and parentage cases. The paramount issue before this court is whether the father should be held in contempt of court for his refusal to pay child support. This is not Caron's first or even second rendezvous with the law of contempt. *Caron v. Caron* (Dec. 3, 1998), Franklin App. No. 98AP–369, unreported, 1998 WL 832163 ("*Caron II*"); *Caron v. Manfresca* (Sept. 23, 1999), Franklin App. No. 98AP–1399, unreported, 1999 WL 739570 ("*Caron III*"). The father defends upon the basis that until this juvenile court has ruled on his parentage action, he need not obey the domestic relations court order mandating the payment of child support. A court order mandating payment of child support is not stayed by the filing of a companion parentage action to disestablish paternity. His defense fails.

"Contempt of court is a mysterious and indefensible offense and as easy to commit as it is liable to speedy and deserved punishment." See the somewhat aged but comprehensive treatise National Lawyer's Manual: Contempt, by Edward M. Dangel (1939) (National Lawyer's Manual Company) ("NLM Contempt"), at 14.

Because many of the rules of contempt law, including the various classifications and due process rights of contempt hearings, are relevant to this case, it may be helpful to review the elusive law of contempt that is both of ancient origin and fundamental contemporary importance. This opinion will examine thoroughly the fundamental issues relating to the law of contempt of court.

## Nature and Purpose of Contempt Law

■ Contempt of court is an act or omission that interferes with the administration of justice. Garner, Dictionary of Modern Legal Usage (1995) (Oxford Univ. Press), at 211. Contempt of court is part of the *lex terrae* ("law of the land") within the meaning of the Magna Carta. *Rex v. Almon, infra.* The phrase "contemptus curiae" (contempt of court) has been a part of the common law since the twelfth century. Borrie & Lowe, Law of Contempt (2 Ed.1983). In 1258, Bracton said: "There is no greater crime than Contempt and Disobedience, for all persons within the Realm ought to be obedient to the King and within his Peace." Bracton's Notebook (1887) (F.W. Maitland Pub. Co.) *The essence of the offense of contempt of court is the defiance of judicial authority.* 13 A.L.R.4th 102, 108.

■ Contempt of court is an act or omission that interferes with the administration of justice, through conduct which disobeys judicial orders, shows disregard and disrespect for the authority and dignity of the law, or tends to embarrass, impede or obstruct the court in the performance of its functions. *In re Green* (1961), 172 Ohio St. 269, 15 O.O.2d 449, 175 N.E.2d 59 paragraph one of the syllabus, reversed on other grounds, *In re Green* (1962), 369 U.S. 689, 82 S.Ct. 1114, 8 L.Ed.2d 198; *Windham Bank v. Tomaszczyk* (1971), 27 Ohio St.2d 55, 56 O.O.2d 31, 271 N.E.2d 815, paragraph one of the syllabus; *Denovchek v. Trumbull Cty. Bd. of Commrs.* (1988), 36 Ohio St.3d 14, 15, 520 N.E.2d 1362, 1363–1364. The purpose of the law of contempt is to uphold and ensure the unimpeded and effective administration of justice, secure the dignity of the court, and affirm the fundamental supremacy of the law. *Windham Bank, supra,* paragraph two of the syllabus; *Cramer v. Petrie* (1994), 70 Ohio St.3d 131, 133, 637 N.E.2d 882, 884–885.

■ What is the nature of the public interest that is served by the law of contempt of court? The individual's right to a fair trial before a court of law is a fundamental right in a free society with a civilized system of justice. It is a basic tenet of an ordered society that to secure the right to a fair trial, it is essential to ensure public faith in the rule of law and the proper administration of justice. The law of contempt of court supports these truths by providing sanctions against misbehaviors that would undermine the guarantees of fair trial, result in disrespect for the rule of law, and cause lack of public confidence in the due administration of justice. "It is justice itself that is flouted by contempt of court, not the individual court or judge who is attempting to administer it." *Atty.–Gen. v. Leveller Magazine* (1979), A.C. 440, 449, 1 All E.R. 745, 749, HL, 1979 WL 68939, cited in Miller, Contempt of Court (Clarendon Press, Oxford 1989), at 1. "These [contempt] powers are given to the Judges to keep the course of justice free; powers of great importance to society, for by the exercise of them law and

order prevail; those who are interested in wrong are shewn that the law is irresistible." Oswald, Contempt of Court, Committal, and Attachment and Arrest Upon Civil Process ("Contempt of Court"). In the Supreme Court of Judicature (Reprint 1997) (Gaunt, Inc.), at 8–9.

■ The term "contempt of court" has rightfully been criticized as misleading and inadequate to describe the gravity of the offense: "The phrase 'contempt of court' does not in the least describe the true nature of the class of offence with which we are here concerned * * *. The offence consists in interfering with the administration of the law; in impeding and perverting the course of justice. * * * It is not the dignity of the Court which is offended—a petty and misleading view of the issues involved—it is the fundamental supremacy of the law which is challenged." *Johnson v. Grant* (Scotland 1923), S.C. 789, at 790, cited in Report of the Committee on Contempt of Court, presented to Parliament by the Lord High Chancellor and the Lord Advocate by Command of Her Majesty, December 1974, Her Majesty's Stationery Office.

■ What are the criteria for the "due administration of justice" that is protected by the offense of contempt of court? A contemporary English decision offers these requirements: "The due administration of justice requires first that all citizens should have unhindered access to the constitutionally established courts of criminal or civil jurisdiction for the determination of disputes as to their legal rights and liabilities; secondly, that they should be able to rely upon obtaining in the courts the arbitrament of a tribunal which is free from bias against any party and whose decision will be based upon those facts only that have been proved in evidence adduced before it in accordance with the procedure adopted in courts of law; and thirdly that, once the dispute has been submitted to a court of law, they should be able to rely upon there being no usurpation by any other person of the function of that court to decide it according to law. Conduct which is calculated to prejudice any of these requirements or to undermine the public confidence that they will be observed is contempt of court." *Atty.–Gen. v. Times Newspapers, Ltd.* (1973), A.C. 273, 309, 3 All E.R. 54, 72, HL, 1973 WL 39987, cited in Miller, Contempt of Court, *supra*, at 141. Take note that concern exists not only with conduct that is likely to cause interference with justice, but also with conduct that might undermine public confidence that the requirements of the due administration of justice will be observed.

■ Contempt proceedings are neither entirely civil nor entirely criminal, but instead are sui generis—special proceedings that may involve both civil and criminal characteristics. *Gompers v. Buck's Stove & Range Co.* (1911), 221 U.S. 418, 441, 31 S.Ct. 492, 498, 55 L.Ed. 797, 806: "Contempts are neither wholly civil nor altogether criminal. * * * It may partake of the characteristics of both."

*Blackmer v. United States* (1932), 284 U.S. 421, 440, 52 S.Ct. 252, 255–256, 76 L.Ed. 375, 384; *Brown v. Executive 200, Inc.* (1980), 64 Ohio St.2d 250, 253, 18 O.O.3d 446, 448–449, 416 N.E.2d 610, 612–613; *Denovchek, supra,* at 16, 520 N.E.2d at 1364–1365. Although "[t]hey bear some resemblance to suits in equity, to criminal proceedings and to ordinary civil actions * * * [t]hey are none of these." *Cincinnati v. Cincinnati Dist. Council 51* (1973), 35 Ohio St.2d 197, 202, 64 O.O.2d 129, 132, 299 N.E.2d 686, 691. "The contempt proceeding may have a dual [civil and criminal] aspect." NLM Contempt, at 75. The Ohio Supreme Court recently held that the character of a contempt proceeding can even change from civil to criminal during the proceeding, with the dissent raising the issue that such transformation may give rise to due process dilemmas. *State v. Russo* (2001), 90 Ohio St.3d 551, 555, 559, 740 N.E.2d 265, 269, 272.

 The contempt proceeding may be considered a trial. *First Bank of Marietta v. Mascrete* (1997), 79 Ohio St.3d 503, 505, 684 N.E.2d 38, 39–40. A trial for criminal contempt "is an independent proceeding at law, and no part of the original cause." *Michaelson v. United States* (1924), 266 U.S. 42, 64, 45 S.Ct. 18, 19, 69 L.Ed. 162, 167. A civil contempt, on the other hand, is part of the original action. *Gompers, supra,* at 444–445, 31 S.Ct. at 499–500, 55 L.Ed. at 807. The power to issue arrest warrants is a "necessary corollary" of the contempt power. *Burt v. Dodge* (1992) 65 Ohio St.3d 34, 35, 599 N.E.2d 693, 694. See R.C. 2705.03.

The determination of the court to uphold the due administration of justice is unmistakably illustrated in *Respublica v. Oswald* (1778), 1 Dallas (Pennsylvania Supreme Court) 319, 329, 1 L.Ed. 155, 160, with the judge addressing the contemnor: "Since, however, the question seems to resolve itself into this, whether you shall bend to the law, or the law shall bend to you, it is our duty to determine that the former shall be the case." Cited in Sir John Fox, The History of Contempt of Court (1972) (London Professional Books Ltd.), at 47.

Most contempt of court actions involve one or more of the following scenarios: (1) disobedience of court orders (most indirect contempts); (2) disruptions in open court (most direct contempts); (3) obstruction of court's processes (blocking of service or execution of judgment); (4) refusal of witness to testify or produce evidence; (5) attempt to obstruct, influence, or intimidate judge, witnesses, or jurors; (6) fraud upon the court (witness or evidence tampering, perjury, forgery, alteration of records); (7) misconduct of court officers, jurors, or witnesses; (8) symbolic acts which invade the court's respect and dignity; and (9) out-of-court statements and publications which attempt to influence judge or jurors. Dobbs, Contempt of Court: A Survey (1973) 56 Cornell L.Rev. 183; NLM Contempt, Chapter XI.

The case *sub judice* involves disobedience of a court order as the act of contempt.

## History of Contempt Law

It is justifiably noted: "Few legal concepts have bedeviled courts, judges, lawyers and legal commentators more than contempt of court." Martineau, Contempt of Court: Eliminating the Confusion Between Civil and Criminal Contempt (1981), 50 U.Cin.L.Rev. 677, at 677. "The law [of contempt of court] is a mess." Dudley, Getting Beyond the Civil/Criminal Distinction (1993), 79 Va.L.Rev. 1025, at 1025. It need not be so.

Much of the confusion surrounding the law of contempt of court can be attributed to the reality that the concept of summary (*i.e.*, without due process safeguards) contempt has changed significantly over the 800 years of its recorded life, especially in the last several centuries, as a result of the struggle between conflicting points of view regarding the necessity of what today is considered to be the dual essential elements of summary contempt: (1) the judge's personal knowledge of the contumacious act, and (2) the contumacious act's imminent threat to the administration of justice. No similar problem exists regarding indirect contempt, which focuses on due process safeguards.

The initial turn of the key to unlock the mystery of the law of contempt is to realize that the historic concept of *summary* contempt included any contempt that disrupted the judicial process, regardless where it occurred (thus possibly lacking "judge's personal knowledge" element), and regardless of the degree of interference with the system of justice (thus possibly lacking "imminent threat" element). The final turn of the key is to realize that this historic concept of unlimited *summary* contempt has been substantially constrained by statute and case law so that today both the "judge's personal knowledge" and the "imminent threat" elements are required for *summary* contempt. The historic lock attempted to be opened in many cases was a "contempt by publication" case.

The history of contempt is inexorably intertwined with the history of the press, with many of the milestones of the law of contempt being laid in "contempt by publication" cases. See fn. 1. After Blackstone writes of the inherent power of contempt ("For laws, without a competent authority to secure their administration from disobedience and contempt, would be vain and nugatory."), he makes a distinction between direct and indirect contempt regarding the imposition of summary sanctions: "If the contempt be committed in the face of the court, the offender may be instantly apprehended and imprisoned, at the discretion of the judges, without any further proof or examination, but in matters that arise at a distance, and of which the court cannot have so perfect a knowledge * * * [the judges] either make a rule on the suspected party to show cause why an

attachment should not issue against him; or, in very flagrant instances of contempt, the attachment issues in the first instance." Blackstone also speaks of contempt *in facie curiae* (in the face of the court) as including, however, contempts "by speaking or writing contemptuously of the court, or judges, acting in their judicial capacity; by printing false accounts (or even true ones without proper permission) of causes then pending in judgment." Absent also is any mention of circumstances akin to "imminent threat." Blackstone, Commentaries on the Laws of England, Book the Fourth, Of Public Wrongs (1765) (Legal Classics Library 1983), at 281–283. In the same year Blackstone penned his Commentaries, 1765, Justice Wilmot ordained the *summary* contempt doctrine for *out-of-court* contempt in the seminal *Almon's Case,* in which bookseller John Almon was held in contempt for publishing a "libel" on the Chief Justice, Lord Mansfield. Justice Wilmot noted in *Almon's Case* that the issuance of attachments for out-of-court contempts "stands upon the same immemorial usage as supports the whole fabrick of the common law." *Rex v. Almon* (K.B.1765), 97 Eng.Rep. 94, 99 (Wilmot, J.).

The writings of Blackstone and the judgment in *Almon's Case* were responsible for the initial reception of the *summary* contempt process into the United States in the late eighteenth century. See *Bloom v. Illinois* (1968), 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522, fn. 2, and *Green v. United States* (1958), 356 U.S. 165, 78 S.Ct. 632, 2 L.Ed.2d 672, fn. 18. Their influence can be seen in the case of *Respublica v. Oswald, supra,* at 329, 1 L.Ed. at 160, the first American contempt-by-publication case. In *Respublica,* a contempt action was brought in the Supreme Court of Pennsylvania against a newspaper publisher who had published a "libel" asserting that the judges of the high court were "influenced by passion and prejudice." The court found the publication to have "the tendency * * * of prejudicing the public (a part of whom must hereafter be summoned as jurors) with respect to the merits of a cause depending in this court," which justified a finding of *summary* contempt, declaring: "Not only my brethren and myself, but, likewise, all the judges of England, think, that without this [contempt] power, no court could possibly exist; nay, that no *contempt* could, indeed, be committed against us, we should be so *truly contemptible.*" (Emphasis of the court.) Thus, *out-of-court* writings and publications as in *Almon's Case,* punished yet today as the most common form of criminal contempt in England, Fox, History of Contempt, *supra,* at 2, also initially came within the *summary* contempt power in America. See fn. 1. See Nelles & King, Contempt by Publication in the United States (1928), 28 Colum.L.Rev. 401.

The impeachment trial (1826–1831) of United States District Judge James Peck, however, had a remarkable and far-reaching effect on the law of contempt in the United States. Judge Peck survived impeachment by only a single vote of

Congress for *summarily* imprisoning lawyer Lawless for the indirect contempt of writing an article that conveyed "a totally false impression of Judge Peck's grounds of decision" of a case. Nelles & King, "Contempt by Publication in the United States" (1928) 28 Colum.L.Rev. 410, 428, 423–430; Frankfurter & Landia, "Power of Congress Over Procedure in Criminal Contempts in Inferior Federal Courts" (1924), 37 Harv.L.Rev. 1010, 1024–1029. In 1831, in the immediate wake of Judge Peck's ordeal, Congress enacted legislation (now Section. 401, Title 18, U.S.Code) (1988) to limit the scope of the federal *summary* contempt power to acts committed "in the presence of the court or so near thereto as to obstruct the administration of justice." Nelles & King, *supra*, at 409–430. The phrase "or so near thereto as to obstruct the administration of justice" was based on the phrase "in the presence of the court" adopted by early English case law. Sir John Fox, History of Contempt of Court, *supra*, at 215. The Act of 1831 also prohibited acts of indirect contempt. Chancellor Kent had no doubt about the Act of 1831 being constitutional and binding on the federal courts, though he disapproved of it: "The Act of Congress * * * reaches and prohibits all interference by attachment and summary punishment for contempt committed outside the presence of the court * * * and it is a very considerable, if not injudicious, abridgement of the immemorially exercised discretion of the Courts in respect to contempts." Kent, Commentaries 3 Ed., at 300. Since 1834, Ohio statute (R.C. 2705.01) has provided: "A court, or judge at chambers, may summarily punish a person guilty of misbehavior in the presence of *or so near* the court or judge as to obstruct the administration of justice." Most state legislatures have enacted similar statutes. See 37 Harv.L.Rev. 1010, 1027, and 1967 Duke L.J. 632, 654–655.

At once, lower federal courts followed the restrictions imposed by the Act, although reluctantly in contempt-by-publication cases. *United States v. Emerson* (1831) 25 Fed.Cas. 1012, 1831 U.S.App. LEXIS 219, 4 Cranch. C.C. 188 (argument "in the hall of entrance, while the court was sitting, was either 'in the presence of the court, or so near thereto as to obstruct the administration of justice,' within the meaning of the act of congress of the 2nd of March, 1831, 'declaratory of the law concerning contempts of court,' " and "the court therefore imposed a fine of five dollars upon each of the parties."); *United States v. Seeley* (1844) (C.C.S.D.N.Y.), 27 Fed.Cas. 1010, 1844 U.S.App. LEXIS 438 (removal of federally liened brig from Brooklyn harbor not summary contempt); *Ex parte Poulson* (1835), 19 Fed.Cas. 1205, 1835 U.S.App. LEXIS 230, 15 Haz.Reg.Pa. 380. The court in *Poulson*, a contempt-by-publication case, first decried the Act of 1831: "The laws will have been enacted in vain, courts of justice will become useless, and suitors be deprived of the benefits of resorting to them for redress, if it shall be their common fate to be obliged to encounter the effect of publications of a description now before us on the merits of their cause. * * * The court is

disarmed in relation to the press. * * *. The law has tied their hands. The judges must be passive. * * * no legal check is interposed. It is left to the discretion of the conductors of public journals, and all others, to take whatever course their sense of public justice requires; to decide what is proper for jurors to hear and see, as guides to their verdict, whether it is the truth or false, the effects of malice, prejudice, or from any excusable motive. * * * Thus it appears that, while suitors in the state courts can be protected against publications like this, they are without protection in the federal courts." The *Poulson* court nevertheless held: "There can be no doubt of the constitutional power of congress to act upon this subject, as far as respects our courts. * * * It is in the discretion of the legislative power to confer upon courts a summary jurisdiction to protect their suitors or itself by summary process, or to deny it. * * * It would ill become any court of the United States to make a struggle to retain any summary power, the exercise of which is manifestly contrary to the declared will of the legislative power."

Four decades after the enactment of the Act of 1831, the United States Supreme Court, in *Ex Parte Robinson* (1873), 86 U.S. (19 Wall.) 505, 510, 22 L.Ed. 205, 207–208, affirmed the inherent contempt doctrine but acknowledged the power of Congress to limit it, stating: "The moment the courts of the United States were called into existence and invested with jurisdiction over any subject, they became possessed of this power [to punish for contempt]. But the power has been limited and defined by the act of Congress if March 2nd, 1931. * * * As thus seen the power of these courts in the punishments of contempts can only be exercised to insure order and decorum in their presence, to secure faithfulness on the part of their officers in their official transactions, and to enforce obedience to their lawful orders, judgments, and processes."

About three-quarters of a century after the lower federal court in *Poulson* cautioned that it "would ill become any court of the United States to make a struggle to retain any summary power, the exercise of which is manifestly contrary to the declared will of the legislative power," the United States Supreme Court handed down *Toledo Newspaper Co. v. United States* (1918), 247 U.S. 402, 38 S.Ct. 560, 62 L.Ed. 1186. In *Toledo*, the court held that the Act of 1831 "conferred no power not already granted and imposed no limitations not already existing," that a newspaper publication commenting on a pending case in federal court constituted contempt because it had a "reasonable tendency" to obstruct the administration of justice, since its purpose was to influence the judge regarding his decision, and that it was immaterial the publication had not been circulated in the courtroom or seen by the judge, because "the wrong depends upon the tendency of the acts to accomplish this result." Under *Toledo*, the question whether the misbehavior took place far from or near to the court does

not arise. The only question is whether it caused or tended to cause an obstruction to the administration of justice; if it did, it must of necessity have been near enough to the court to do so. Justice Holmes's dissent, in which Justice Brandeis concurred, is a vanguard to contemporary American contempt law, pointing out "the limit [so near as to obstruct] is too plain to be construed away," and summary sanction is justified only in cases of imminent threat ("only immediate and necessary action is contemplated").

A generation later, in *Nye v. United States* (1941), 313 U.S. 33, 47, 61 S.Ct. 810, 815, 85 L.Ed. 1172, 1180, the United States Supreme Court rendered its most definitive decision regarding the Act of 1831, overruling *Toledo*. In doing so, the court in *Nye* said: "The inaccuracy of that historic observation [in Toledo that the Act 'conferred no power not already granted and imposed no limitations not already existing'] has been plainly demonstrated." Citing *Ex parte Poulson, supra,* and a handful of similar decisions, the court said further: "That the previously undefined power of the courts was substantially curtailed by that Act was early recognized by lower federal courts * * * [and] that view persisted to the time when *Toledo Newspaper Co. v. United States, supra,* was decided." *Nye* decreed that under the federal statute, *summary* contempt encompasses only contempts committed in the *physical presence* of the court *or so near* as to represent an *immediate threat* to the orderly conduct of its business, ruling that the test is "physical proximity not relevancy."

Federal and state case law, heeding statute while yet to varying degrees maintaining the inherent nature of the power of contempt, has significantly narrowed the concept of *direct* contempt, but has also created several legal fictions that permit it to include acts committed *outside the physical presence of the judge.* These legal fictions embody contumacious acts (a) committed in any "constitute part of the court" (*Ex parte Savin* [1889], 131 U.S. 267, 276–278, 9 S.Ct. 699, 701–702, 33 L.Ed. 150, 153–154; *Nye v. United States* [1941], 313 U.S. 33, 48, 61 S.Ct. 810, 815–816, 85 L.Ed. 1172, 1180; *Beach v. Beach* [1946], 79 Ohio App. 397, 403, 35 O.O. 172, 175, 74 N.E.2d 130, 134: "The court is present wherever any of its constituent parts is engaged in the prosecution of the business of the court according to law"; 42 A.L.R.2d 970), and (b) committed in the "constructive presence of the judge" (*State v. Union,* (1961), 172 Ohio St. 75, 15 O.O.2d 133, 173 N.E.2d 331 paragraph two of the syllabus ["A court is constructively present wherever any of its court officers are engaged in the execution of the business of the court according to law"]; *State v. McFaul* [1983], 5 Ohio St.3d 120, 5 OBR 255, 449 N.E.2d 445, syllabus [striking someone in courtroom in presence of court officers but not the judge is within "constructive presence of court"]; *Federal Land Bank v. Walton* [1995], 99 Ohio App.3d 729, 734, 651 N.E.2d 1048, 1051 [filing of slanderous pleading with clerk of courts is

within "constructive presence of trial judge"] ). English law is similar. Miller, Contempt of Court, *supra*, at 99.

Ohio and federal contempt law may differ as to definition and penalty standards, because while such standards are controlled by case law (despite statute) in Ohio, they are controlled by statute in the federal courts. Section 401, Title 18, U.S.Code provides: "A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as (1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice, (2) Misbehavior of any of its officers in their official transactions, and (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command." The Federal Rules of Criminal Procedure provide for summary sanction only where "the judge certifies that he saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court." Fed.Crim.R. 42(a). English contempt law also is controlled by statute. Contempt of Court Act 1981, Section 14(1).

Federal and Ohio law share constitutional due process requirements in matters of contempt, however, because due process safeguards must be honored, not because they may be incorporated into statutes, but rather because the United States Constitution and the Ohio Constitution mandate them.

Thus, America and England have traveled different paths in seeking to resolve the conflicting interests between a fair trial and a free press. See fn. 1. Although today's *summary* contempt rules (*i.e.,* "presence of court/imminent threat") in the United States in large part have been developed in "contempt by publication" cases, they are applicable, of course, to all types of contempt cases, and have fatefully shaped the law of contempt in America.

### Inherent Power of Contempt

■ Contempt proceedings constitute the inherent means by which courts enforce their lawful orders and affirm the rule of law. *Cincinnati v. Council, supra*, at 202, 64 O.O.2d at 132, 299 N.E.2d at 691–692. "The power to punish for contempt * * * is necessarily inherent in every court independent of statute." NLM Contempt, at 17. "Without such power * * * the administration of the law would be in continual danger of being thwarted by the lawless." *Ex parte Terry* (1888), 128 U.S. 289, 303, 9 S.Ct. 77, 79, 32 L.Ed. 405, 408; *United States v. Hudson* (1812), 11 U.S. (7 Cranch) 32, 34, 3 L.Ed. 259, 260, (contempt power "necessary to the exercise of all others"); *Anderson v. Dunn* (1812), 6 Wheat. 204, 227, 5 L.Ed. 242, 247–248; *Ex parte Kearney* (1822), 7 Wheat. 38, 5 L.Ed. 391; *Young v. United States* (1987), 481 U.S. 787, 799, 107 S.Ct. 2124, 2135, 95 L.Ed.2d 740, 753, quoting *Michaelson v. United States* (1924), 266 U.S. 42, 66, 45 S.Ct. 18, 20, 69 L.Ed. 162, 167: "While the exercise of the contempt power is

subject to reasonable [legislative] regulation, 'the attributes which inhere in that power and are inseparable from it can neither be abrogated nor rendered practically inoperative.' " "A Court of Justice without power to vindicate its own dignity, to enforce obedience to its mandates, to protect its officers, or to shield those who are entrusted to its care, would be an anomaly which could be permitted to exist in no civilized community." Oswald, Contempt of Court, *supra*, at 8.

The Supreme Court of the United States has held that the United States Constitution "cannot be interpreted safely except by reference to the common law and to British institutions as they were when the instrument was framed and adopted," holding that the English common law of contempt was adopted by the united States upon establishment of the United States Constitution. *Ex parte Grossman* (1925), 267 U.S. 87, 108–109, 45 S.Ct. 332, 333, 69 L.Ed. 527, 530–531. Sir John Fox challenges this claim upon the basis that Justice Wilmot's judgment that ordained the *summary* contempt doctrine for *out-of-court* contempt in *Almon's Case*, although decided in the Court of King's Bench in 1765, lay concealed and undelivered until 1802, and was not cited in an English court until 1811, a generation after the establishment of the United States Constitution in 1787. Fox, History of Contempt of Court, *supra*, at 207. The courts in the United States nevertheless adhere to the principle that American courts possess inherent contempt power derived from the common law. "The right to punish for contempts in a summary manner has been long admitted as inherent in all courts of justice * * * founded upon great principles which are coeval and must be coexistent with the administration of justice in every country, the power of self-protection * * *. It is a branch of the common law brought from the mother country and sanctioned by the Constitution." *State v. Morrill* (1855), 16 Ark. 384, 1855 WL 607, cited in Sir John Fox, The History of the Law of Contempt, *supra*, at 218–219. "The power to punish for contempt is as old as the law itself and has been exercised so often that it would take a volume to refer to the cases. From the earliest dawn of civilization the power has been conceded to exist. * . * * The courts of England have uniformly from the beginning, exercised the right to punish for contempt and the courts of America have always exercised a like power." *State v. Shepherd* (1903), 177 Mo. 205, 222–223, 76 S.W. 79, 84, cited in Sir John Fox, The History of the Law of Contempt, *supra*, at 221–222.

 The source of the contempt authority of Ohio courts lies in the inherent power of the court—not the legislature or the Constitution. More than a century ago, the Supreme Court of Ohio in *Hale v. State* (1896), 55 Ohio St. 210, 213, 45 N.E. 199, 200, proclaimed this law of "immemorial antiquity," declaring "Such [contempt] powers, from both their nature and their ancient exercise, must be regarded as inherent. They do not depend upon express constitutional grant,

nor in any sense upon the legislative will * * *. Without such power no other [power] could be exercised." More recently, the Supreme Court of Ohio reaffirmed the inherent contempt power doctrine in *Zakany v. Zakany* (1984), 9 Ohio St.3d 192, 9 OBR 505, 459 N.E.2d 870, syllabus, and *Denovchek, supra,* at 15–16, 520 N.E.2d at 1363–1365. As reiterated in *State v. Union* (1961), 172 Ohio St. 75, 15 O.O.2d 133, 173 N.E.2d 331, paragraph one of the syllabus: "The inherent power of a court to punish for contempt of court may not be limited by legislative authority, nor does such power depend upon express constitutional grant." The Ohio Supreme Court said in *Wind v. State* (1921), 102 Ohio St. 62, 64, 130 N.E. 35, 36, citing *Miller v. State* (1854), 3 Ohio St. 475, 1854 WL 39: "The power of a court to enforce its own proper orders is fundamental and inherent * * * upon the broad ground of public policy, and without which power the judicial edifice would fall."

"Historically and rationally the inherent power of courts to punish contempts * * * is not open to question. This attribute of courts is essential to preserve their authority and to prevent the administration of justice from falling into disrepute." *Fisher v. Pace* (1949), 336 U.S. 155, 159, 69 S.Ct. 425, 427, 93 L.Ed. 569, 573. "The power to punish for contempts is inherent in all courts; its existence is essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders and writs of the courts, and consequently to the administration of justice." *Ex parte Robinson, supra,* at 510, 22 L.Ed. at 207. See 121 A.L.R. 215. The Supreme Court of the United States has declared that the doctrine of separation of powers is a pillar in the foundation of the inherent contempt doctrine: "The Judiciary—concededly the weakest of the three coordinate departments of government—must not be obligated to depend on the Executive for the enforcement of its decrees. Such dependence would violate the principle of separation of powers upon which our governmental structure is based." *Ex parte Grossman, supra,* at 98.

Without the power of contempt, courts would be rendered powerless and unable to function. Over a century ago, the Supreme Court of the United States, in *Ex parte Terry, infra,* at 313, 9 S.Ct. at 83, 32 L.Ed. at 412 declared: "Without [the inherent power of contempt], judicial tribunals would be at the mercy of the disorderly and violent, who respect neither the laws enacted for the vindication of public and private rights, nor the officers charged with the duty of administering them." The Supreme Court of the United States also declared unequivocally in *Gompers v. Buck's Stove, supra,* at 450, 31 S.Ct. at 501, 55 L.Ed. at 809: "For while it is sparingly to be used, yet the power of courts to punish for contempts is a necessary and an integral part of the independence of the judiciary, and is absolutely essential to the performance of the duties imposed on them by law * * *. If a party can make himself a judge of the validity of orders which have

been issued, and by his own act of disobedience set them aside, then are the courts impotent, and what the Constitution now fittingly calls the 'judicial power of the United States' would be a mere mockery."

A century ago, the Supreme Court of Missouri, in *State v. Shepherd* (1903), 177 Mo. 205, 270, 76 S.W. 79, 100, articulated the inherent power of contempt quite colloquially: "To be a judge * * * is the highest honor that can be conferred upon mortal man. To be a judge without such [contempt] powers as a judge, were to be a kickingpost for every madman, a butt for every idiot or knave, and withal, an object of contempt of all men."

The Supreme Court of Ohio has consistently affirmed the absolute necessity of the power of contempt to the operation of our courts. *State v. Union, supra,* at 80–81, 15 O.O.2d at 136–137, 173 N.E.2d at 336–337: "That a court inherently, and quite apart from any statutory authority or express constitutional grant, possesses such contempt power has been the rule from time immemorial. * * * [I]t is difficult to conceive of a power more essential to the administration of justice or one more vital to the very existence of a court itself." The Ohio Supreme Court noted in *Atty. Gen. v. Albin* (1928), 118 Ohio St. 527, 161 N.E. 792, paragraph one of the syllabus, that "[a] court created by the constitution has inherent power to define and punish contempts, such power being necessary to the exercise of judicial functions." And in *Beach v. Beach* (1946), 79 Ohio App. 397, 405, 35 O.O. 172, 176, 74 N.E.2d 130, 135, the court pointed out that "[w]ithout the inherent power of the courts to punish for contempt, which power is necessarily incident to the exercise of all judicial functions, the courts would be mere puppets and their orders farcical."

"The phrase 'contempt in the face of the court' has a quaint old-fashioned ring about it; but the importance of it is this: of all the places where law and order must be maintained, it is here in these courts. The courts of justice must not be deflected or interfered with. Those who strike at it, strike at the very foundations of our society. To maintain law and order, the judges have, and must have, power at once to deal with those who offend against it. It is a great power—a power instantly to imprison a person without a trial—but it is a necessary power." *Morris v. Crown Office* (1970), 2 Q.B. 114, 122, 1 All E.R. 1079, 1081, cited in Borrie & Lowe, The Law of Contempt, *supra,* at 6.

■ Although the contempt authority should be limited to the "least possible power adequate to the end proposed," *Hicks v. Feiock* (1987), 485 U.S. 624, 637, 108 S.Ct. 1423, 1432, 99 L.Ed.2d 721, 735, fn. 8, quoting *Shillitani v. United States* (1966), 384 U.S. 364, 371, 86 S.Ct. 1531, 1536, 16 L.Ed.2d 622, 628, quoting *Anderson v. Dunn, supra,* at 231, 5 L.Ed. at 248–249, courts have an absolute duty to safeguard the administration of justice by use of the contempt power

where appropriate. As plainly stated by the Ohio Supreme Court in *State v. Union, supra,* at 89–90, 15 O.O.2d at 141–142, 173 N.E.2d at 341–342:

"If courts are to be maintained and if they are to function properly in carrying out their constitutional and statutory duties, the defiance of court authority * * * cannot be tolerated. Courts must vigorously protect the dignity of their judgments, orders, and process. *All those who would by misconduct obstruct the administration of justice must be on notice that they do so at their peril.*" (Emphasis added.)

The instant case primarily involves inherent contempt powers, and only incidentally involves statutory contempt powers.

### Direct and Indirect Contempt, and Summary Contempt

 Contempt of court is classified as (a) direct contempt, and (b) indirect contempt. A direct contempt generally is a contumacious act primarily directed at the court rather than the opposing party, and usually is punished as criminal contempt. An indirect contempt generally is a contumacious act primarily directed at the opposing party rather than the court, and usually is punished as civil contempt. See Judge V. Michael Brigner, Contempt Issues in Ohio Domestic Relations Law 2000, Ohio Judicial College; NLM Contempt, Chapters IX and X.

 The fundamental distinction between direct contempt and indirect contempt lies in the location of the act of contempt—whether it takes place within the presence of the judge, or elsewhere. "A direct contempt is one committed in the presence of or so near the court as to obstruct the due and orderly administration of justice." *In re Lands* (1946), 146 Ohio St. 589, 595, 33 O.O. 80, 83, 67 N.E.2d 433, 437. "It is said that direct contempt takes place in the presence of the court, and indirect contempt is all other contempt." *Cincinnati v. Cincinnati Dist. Council 51* (1973), 35 Ohio St.2d 197, 202, 64 O.O.2d 129, 132, 299 N.E.2d 686, 691. The significance of the location is directly related to the issue whether the judge has *personal knowledge* of the contumacious act.

A prevalent misconception exists yet today that *direct* contempt is synonymous with *summary* (*i.e.,* without due process) contempt; or to state it differently, that every direct contempt justifies a *summary* sanction; or to again state it differently, that where the contumacious act is committed "within the presence of the court," it need not constitute an "imminent threat to the administration of justice" to justify a *summary* sanction. Assuming a contumacious act qualifies as a direct contempt, however, this is simply a precursor to one of the essential issues of present-day contempt law in America—whether the circumstances of the direct contempt include *both* essential elements of *summary* contempt: (a) the "judge's personal knowledge" and (b) the "imminent threat to the administration

of justice." This is the issue that must ultimately be resolved because it determines whether *summary* sanction is justified or whether a multitude of constitutional rights are applicable in a due process hearing.

The dual essential elements of *summary* contempt, *Ex parte Terry* (1888), 128 U.S. 289, 9 S.Ct. 77, 32 L.Ed. 405; *Cooke v. United States* (1925), 267 U.S. 517, 45 S.Ct. 390, 69 L.Ed. 767; *In re Oliver* (1948), 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682, are:

1. A contumacious act committed in open court in the judge's presence and immediate view that results in the *judge's personal knowledge* and makes further evidence unnecessary for a summary finding of contempt *("judge's personal knowledge" element)*, and

2. The contumacious act constitutes an *imminent threat* to the administration of justice that may result in demoralization of the court's authority unless the court imposes a summary contempt sanction *("imminent threat" element)*.

The language of the Supreme Court of the United States, in *In re Oliver*, *supra*, at 274–276, 68 S.Ct. at 508–509, 92 L.Ed. at 694–696, describing the *"judge's personal knowledge"* and *"imminent threat"* elements of summary contempt, is worth repeating, at length:

"There [in *Cooke*] it was pointed out that for a court to exercise the extraordinary but narrowly limited power to punish for contempt without an adequate notice and opportunity to be heard, the court-disturbing misconduct must not only occur in the court's immediate presence, but that *the judge must have personal knowledge* of it acquired by his own observation of the contemptuous conduct. This Court said that knowledge acquired from the testimony of others, or even from the confession of the accused, would not justify conviction without a trial in which there was an opportunity for defense." (Emphasis added.)

"Except for a narrowly limited category of contempts, due process of law as explained in the *Cooke* case requires that the accused contemnor's constitutional rights be honored.

"The narrow exception to these due process requirements includes only charges of misconduct, in open court, in the presence of the judge, which disturbs the court's business, where all of the essential elements of the misconduct are under the eye of the court, are actually observed by the court, and *where immediate punishment is essential to prevent 'demoralization of the court's authority'* before the public." (Emphasis added.)

In this opinion, the term *"summary contempt"* refers only to circumstances where *both essential elements* (the *judge's personal knowledge* which justifies an

immediate finding of direct contempt, and an *imminent threat* to the administration of justice which justifies the immediate imposition of a sanction) co-exist.

Another way to express the concept that summary contempt consists of dual essential elements is to recognize the rule that not every finding of direct contempt justifies a summary sanction. Odem & Baker, Direct and Constructive Contempt (1974), 26 Baylor L.Rev. 147. The court *In re Davis* (1991), 77 Ohio App.3d 257, 263–264, 602 N.E.2d 270, 274–275, states this often-overlooked rule simply and to the point:

"It seems clear that under the rules of *Cooke* and *Oliver* a summary proceeding is not authorized simply because the conduct constitutes direct contempt. Even if the external facts are clear because they took place in the presence of the judge, the effect of the contumacious conduct must create a 'need for speed' to immediately suppress the court-disrupting misbehavior and restore order to the proceedings. * * * Absent that need, an evidentiary hearing is required even though the contempt is 'direct.'"

As very well said by Judge Joseph A. Artl of the Cuyahoga County Court of Appeals in *State v. Treon, supra*, at paragraph one of the syllabus:

"To constitute direct contempt the alleged misbehavior must (1) require immediate punishment to preserve the court's authority, (2) take place in the presence of the judge in open court or in or before any of its constituent parts, such as the courtroom or the jury, and (3) obstruct the administration of justice by delaying or injuring or influencing a pending case."

The definition of summary contempt in *Treon*, however, should *not* be read to include an implied "pending case" requirement. There is no "pending case" requirement in the law of contempt of court.[1]

---

1. The potentially misleading "pending case" language at the end of the definition of contempt in *Treon* is based upon a misreading of an earlier decision in the same court, and the resulting misstatement that that decision holds that "a direct contempt is not possible where there was no pending case at the *time* of the alleged wrongdoing." (Emphasis added.) *State v. Treon, supra*, at 241, 188 N.E.2d at 316. *Treon's* "pending case" confusion was caused by equating the material issue regarding *where* the contumacious act occurred (*i.e.*, in/outside the presence of the judge) with the immaterial issue regarding *when* the contumacious act occurred (*i.e.*, during/not during pending litigation), and then unfortunately reflecting *both issues* in the general definition. *Treon* is frequently cited for the rule that a full and complete record of the facts must accompany a finding of direct contempt to ensure the right of appellate review. Only a few of the cases citing *Treon* restate the superfluous "pending case" language, and of those that do, none has been decided upon the basis of a "pending case" issue. By definition, the concept of contempt, direct, indirect, and summary, includes contumacious acts which are shown not only to *actually result* in discrediting the administration of justice, but also contumacious acts which have a *tendency to result* in discrediting the administration of justice. *In re Green*, 172 Ohio St. 269, 15 O.O.2d 449, 175 N.E.2d 59, *supra; In re Green*, 369 U.S. 689, 82 S.Ct. 1114, 8 L.Ed.2d 198, *supra; Windham Bank v. Tomaszczyk, supra; Denovchek, supra.*

*There is no "pending case" requirement in the law of contempt of court in the United States.* This is not true in England today, however, because the mother country has taken a different path in seeking to resolve the conflicting interests between a fair trial and a free press. Although England has a constitutional history dating back at least to 1080, recorded in literally hundreds of constitutional documents, Adams & Stephens, Select Documents of English Constitutional History (1901) (MacMillan), it has no constitution as such and no First Amendment. England has exercised strong authority that the paramount public interest lies in protecting the due administration of justice and it is only at the conclusion of a trial that the balance shifts to allow full and free debate, whereas in the United States the public interest in freedom of expression has been accorded a clear preference over the public interest in securing fair trials. Miller, Contempt of Court, *supra*, at 13. Last century's "contempt by publication/freedom of speech" American cases transformed the *"tendency to prevent a fair trial" standard* into an almost insurmountable elevated *"clear and present danger to the administration of justice" standard.* It was during this period when the *"pending case"* issue was relevant in America, as it is yet today in England. Any *"pending case"* language in the United States law of contempt is limited to these "contempt by publication" cases, which are *fait accompli.* See *Myers v. State* (1889), 46 Ohio St. 473, 491, 22 N.E. 43, 44–45 ("The offense consisted in the tendency of his acts to prevent a fair trial of the cause *then pending in the court."*); *Toledo Newspaper Co. v. United States* (1917), 247 U.S. 402, 38 S.Ct. 560, 62 L.Ed. 1186 (holding that the Act of 1831 "conferred no power not already granted and imposed no limitations not already existing," and a publication commenting on a pending case in federal court constitutes a contempt where it has a "reasonable tendency" to obstruct the administration of justice); *Near v. Minnesota* (1931), 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (although "punishment for the abuse of the liberty accorded to the press is essential to the protection of the public," there can be no "previous restraints" upon publication, and a state statute providing for the abatement, as a public nuisance, of a "malicious, scandalous and defamatory newspaper, magazine or other periodical" is unconstitutional because "[t]his is the essence of censorship"); *Nye v. United States* (1941), 313 U.S. 33, 61 S.Ct. 810, 85 L.Ed. 1172 (overruling *Toledo*, the court acknowledged: "[T]he inaccuracy of that historic observation [in *Toledo*, that the Act "conferred no power not already granted and imposed no limitations not already existing"] has been plainly demonstrated.") Citing *Ex parte Poulson, supra*, and a handful of similar decisions, the *Nye* court said further: "That the previously undefined power of the courts was substantially curtailed by that Act was early recognized by lower federal courts * * * [and] that view persisted to the time when *Toledo Newspaper Co. v. United States, supra*, was decided." *Nye* decreed that under the federal statute, *summary* contempt only encompasses contempts committed in the *physical presence* of the court *or so near* as to represent an *immediate threat* to the orderly conduct of its business, ruling that the test is "physical proximity not relevancy."; *Bridges v. California* (1941) 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192 (split decision adopting and applying *"clear and present danger" test* of *Schenck v. United States* (1919) 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed.470, to "contempt-by-publication" cases), declaring: The English common law is inapplicable in this country on questions concerning liberty of speech and press * * *. "[T]he unqualified prohibitions laid down by the framers were intended to give to liberty of the press, as to the other liberties, the broadest scope that could be countenanced in an orderly society. * * * For it is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions. And an enforced silence, however limited, solely in the name of preserving the dignity of the bench, would probably engender resentment, suspicion, and contempt much more than it would enhance respect. * * * *Clear and present danger of substantive evils as a result of indiscriminate publications regarding judicial proceedings justifies an impairment of the constitutional right of freedom of speech and press only if they evils are extremely serious and the degree of imminence extremely high.* * * * The possibility of engendering disrespect for the judiciary as the result of the published criticism of a judge is not such a substantive evil as will justify impairment of the constitutional right of freedom of speech and press"); *Pennekamp v. Florida* (1946), 328 U.S. 331, 346, 347, 355, 66 S.Ct. 1029, 1037, 1041, 90 L.Ed. 1295, 1307–1308 (compare majority opinion: "Free discussion of the problems of society is a cardinal principal of Americanism—a principle which all are zealous to preserve. * * * We

■ Unfortunately, to emphasize in contempt law the "presence" issue (*i.e.*, whether under the "or so near" definition a particular contumacious act does or does not constitute direct contempt) in many cases obscures the real issue— whether there is a failure to honor mandatory constitutional guarantees for any contempt other than *summary contempt*. Even though an act of contempt committed in a constitute part of the court under the "or so near" definition of direct contempt may be considered as being committed within the presence of the judge, the real issue remains whether the judge has personal knowledge of the act and whether there exists an imminent threat to the administration of justice. Only where these dual essential elements co-exist can *summary (i.e., without due process procedures)* sanction be imposed. "[I]t is the better practice, and strongly recommended, that, where a judge has no personal knowledge of the alleged act of contempt because of its commission beyond his own actual physical

---

think the specific freedom of public comment should weigh heavily against a possible tendency to influence *pending cases*. Freedom of discussion should be given the widest range compatible with the essential requirement of the fair and orderly administration of justice," with Justice Frankfurter's concurring opinion: "A free press is not to be preferred to an independent judiciary, nor an independent judiciary to a free press. Neither has primacy over the other; both are indispensable to a free society"); *Craig v. Harney* (1947), 331 U.S. 367, 67 S.Ct. 1249, 91 L.Ed. 1546 (holding that to impose a contempt sanction "[t]he fires which [the expression] kindles must constitute an *imminent, not merely a likely, threat to the administration of justice.*" Stating further: "The danger must not be remote or even probable; it must *immediately imperil * * **. Freedom of speech and press should not be impaired through the exercise of the power to punish for contempt of court unless there is no doubt that the utterances in question are a serious and *imminent threat* to the administration of justice * * *."; *Craig* held that a publication, while a motion for a new trial is pending, of newspaper articles that unfairly report the facts of a civil case, and an editorial criticizing in intemperate language the judge's conduct of the trial, calling it "high handed," a "travesty on justice," and as giving a "raw deal" which properly "brought down the wrath of the public upon the judge's head" does not constitute such a serious and imminent threat to the ability of the court to be punishable as contempt of court; *Wood v. Georgia* (1962), 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569 (reversing contempt-by-publication decision where the record lacked evidence that contemnor's press releases and statement to the grand jury posed a clear and present danger to their proceedings, following *Bridges, Pennekamp,* and *Craig*).

In contrast, the foundation for the modern law of contempt in England was laid in the eighteenth century, the same period that saw the beginnings of the rise of the press. The first case in which the publisher of a prejudicial article was held guilty of contempt occurred in 1720 (*Pool v. Sacheveral* [1720], 1 P. Wms. 675), and was followed by the well-known cases of *St. James' Evening Post*, 2 Atk. 469, in 1742, and *Rex v. Almon*, Wilm. 243; 97 E.R. 94, in 1765, cited in Report of the Committee on Contempt of Court Presented to Parliament by the Lord High Chancellor and the Lord Advocate by Command of Her Majesty, *supra*, at 4. Contrast with American case law, the concept of "trial by newspaper" or "trial by television" in English law which is particularly sensitive about such "trials" because they "deprive the Court of the power of doing that which is the end for which it exists—namely, to administer justice duly, impartially, and with reference solely to the facts judicially brought before it. Their tendency is to reduce the court which has to try the case to impotence, so far as the effectual elimination of prejudice and prepossession is concerned." Per Wills, J., in *Rex v. Parke* (1903), 2 K.B. 432, 437, cited in Borrie & Lowe, The Law of Contempt, *supra*, at 36. See 33 A.L.R.3d 1116.

presence, the procedure outlined in the [indirect contempt] statute * * * be adhered to strictly." *State v. Union, supra*, at 82, 15 O.O.2d at 138, 173 N.E.2d at 337–338; *State v. McFaul, supra*, at 122, 5 OBR at 256–257, 449 N.E.2d at 447–448; *In re Davis, supra*, at 264, 602 N.E.2d at 274–275. "Although the power to proceed by attachment * * * is undoubted, yet 'the preferable course is to proceed by information or indictment so as to avoid placing [the court] in the invidious situation of deciding where [it] may be supposed to be [a party].' " Oswald, Contempt of Court, *supra*, at 12, quoting a note on *Rex v. Almon* in Campbell's "Lives of the Chief Justices." Where the judge has some direct personal knowledge of the contumacious act because it took place in his presence, but the testimony of witnesses nevertheless is necessary to establish contempt, the court should conduct a hearing with due process safeguards. *In re Neff,* paragraphs three and four of the syllabus.

Case law focuses on the "presence of the judge" component of the "judge's personal knowledge" element, but the "imminent threat" element involves a more subjective determination and cannot judiciously be overlooked. To justify a finding of summary contempt and imposition of summary sanction today, the contumacious act must pose a threat that requires immediate sanction to preserve the dignity and authority of the court. As stated by the Ohio Supreme Court in *Cincinnati v. Council, supra*, at 213, 299 N.E.2d at 697: "The invocation of the court's summary power for direct contempt is an awesome power that the court must be cautious in using * * * [that] should be restricted to activity that threatens the integrity or the very functioning of the judicial process." Summary contempt was designed to fill "the need for immediate penal vindication of the dignity of the court." *Cooke v. United States, supra*, at 536, 45 S.Ct. at 395, 69 L.Ed. at 774. Summary contempt under the federal statute (Section 401, Title 18, U.S.Code) and rule (Fed.Crim.R.42) is reserved for cases where there is such a "serious threat to orderly procedure that instant and summary punishment, as distinguished from due and deliberate procedures * * * [is] necessary." *Harris v. United States* (1965), 382 U.S. 162, 86 S.Ct. 352, 15 L.Ed.2d 240. "It is highly necessary * * * where the functions of the Court have to be exercised in a summary manner, that the Judge in dealing with the alleged offence should not proceed otherwise than with great caution and deliberation * * * [T]he jurisdiction ought to be most deliberately and carefully exercised, and then only in extreme cases and where absolutely necessary." Oswald, Contempt of Court, *supra*, at 12. As vividly described by the United States Supreme Court in *In re Little* (1972), 404 U.S. 553, 555, 92 S.Ct. 659, 660, 30 L.Ed.2d 708, 710–711, quoting *Craig v. Harney* (1947), 331 U.S. 367, 376, 67 S.Ct. 1249, 1255, 91 L.Ed. 1546, 1552: "The fires which [the contumacious act] kindles must constitute an imminent, not merely a likely, threat to the administration of justice. The danger must not be remote or even probable; it must immediately imperil." See, also,

*State v. Conliff* (1978), 61 Ohio App.2d 185, 15 O.O.3d 309, 401 N.E.2d 469, syllabus, and *State v. Schiewe* (1996), 110 Ohio App.3d 170, 173, 673 N.E.2d 941, 943. English courts insist that the summary contempt power be used only "when it is urgent and imperative to act immediately." *Balogh v. Crown Court at St. Albans* (1975), Q.B. 73, 3 All E.R. 283, 1974 WL 41080. "[T]his summary power of punishing for contempt should be used sparingly and only in serious cases. It is a power which a court must of necessity possess; its usefulness depends upon the wisdom and restraint with which it is exercised." *Parashuram Detaram Shamdasani v. King Emperor* (1945), A.C. 264, 270, 1945 WL 22360, cited in Borrie & Lowe, The Law of Contempt, *supra*, at 9.

Many contempts mistakenly thought to be summary contempts are reversed upon appeal for lack of the "imminent threat" element. *In re Oliver, supra*, at 275, 277, 68 S.Ct. at 508, 509–510, 92 L.Ed. at 695, 696; *Cooke v. United States, supra*, at 536, 45 S.Ct. at 394–395, 69 L.Ed. at 773–774 (misbehavior must create "an open threat to the orderly procedure of the court," to the extent that if "not instantly suppressed and punished, demoralization of the court's authority will follow"); *In re Davis, supra*, at 263–264, 602 N.E.2d at 274; *In re Parker* (1995), 105 Ohio App.3d 31, 35, 663 N.E.2d 671, 673–674; *State v. Newman* (Apr. 3, 1998), Scioto App. Nos. 97CA2507 and 97CA2525, unreported, 1998 WL 151386. In this regard, high courts repeatedly caution that an insult to the judge is not likely to equate to the required imminent threat necessary for a finding and sanction of summary contempt. "Trial courts no doubt must be on guard against confusing offenses to their sensibilities with obstruction to the administration of justice." *Brown v. United States* (1958) 356 U.S. 148, 153, 78 S.Ct. 622, 626, 2 L.Ed.2d 589, 596. "Judges are supposed to be men of fortitude, able to thrive in a hardy climate." *In re Little* (1972), 404 U.S. 553, 555, 92 S.Ct. 659, 660, 30 L.Ed.2d 708, 711, citing *Craig v. Harney* (1947), 331 U.S. 367, 376, 67 S.Ct. 1249, 1255, 91 L.Ed. 1546, 1552. "Where the contempt charged has in it the element of personal criticism or attack upon the judge, * * * the judge must banish the slightest personal impulse to reprisal." *Cooke v. United States, supra*, at 539, 45 S.Ct. at 396, 69 L.Ed. at 775. *State v. Conliff* (1978), 61 Ohio App.2d 185, 186, 15 O.O.3d 309, 312–313, 401 N.E.2d 469, 474 (contempt conviction in "banana-cream pie in Governor's face" case, where defendant asked judge before sentencing, "Are you ready for your ounce of flesh now, your Honor?" reversed because comment was not disruptive of court proceedings); *State v. Drake* (1991), 73 Ohio App.3d 640, 644, 598 N.E.2d 115, 118 (contempt conviction where defendant directed ultimate vulgarity at judge immediately after sentencing on criminal charge, and judge responded with contempt sanction reversed because court proceedings concluded and thus not disrupted); *In re Parker* (1995), 105 Ohio App.3d 31, 36, 663 N.E.2d 671, 674–675. See 37 A.L.R.4th 1004 and 3 A.L.R.Fed. 420.

The rationale for dispensing with proof of the contumacious act for a finding of direct contempt is that the contemnor "has already by his own voluntary acts placed the evidence directly before the court under circumstances which preclude the court from having any opportunity to advise him of any constitutional rights which might otherwise have been available to him." *In re Neff* (1969), 20 Ohio App.2d 213, 49 O.O.2d 312, 254 N.E.2d 25, paragraph four of the syllabus.

The harm to be prevented by summary finding and sanction is *demoralization of the court's authority.* The *judge's personal knowledge* constitutes justification for *summary* finding, and the *imminent threat* constitutes justification for *summary* sanction, because "unless such an open threat to the orderly procedure of the court and such a flagrant defiance of the person and presence of the judge before the public * * * is not instantly suppressed and punished, *demoralization of the court's authority will follow.* * * *" *Cooke, supra* at 536, 45 S.Ct. at 394–395, 69 L.Ed. at 773." "To preserve order in the courtroom for the proper conduct of business, the court must act instantly to suppress disturbance or violence or physical obstruction or disrespect to the court when occurring in open court. There is no need of evidence or assistance of counsel before punishment, because the court has seen the offense. Such summary vindication of the court's dignity and authority is necessary. It has always been so in the court's dignity and authority is necessary. It has always been so in the courts of the common law and the punishment imposed is due process of law." (Emphasis added.) *Cooke v. United States, supra,* at 534, 45 S.Ct. at 394, 69 L.Ed. at 773. "The reason for authorizing the court to summarily punish direct contempt without the necessity of notice and an opportunity to be heard is that unless such an open threat to the orderly procedure of the court is not instantly suppressed and punished, *demoralization of the court's authority may follow."* (Emphasis added.) *State v. Conliff, supra,* at 188–189, 15 O.O.3d at 310–312, 401 N.E.2d at 472–473.

 Thus, the essential factors which identify *summary contempt justifying both summary finding and summary sanction* are (1) the *judge's personal knowledge* of the contumacious act, and (2) the necessity for summary action because of the *imminent threat* to the administration of justice. Where only the judge's personal knowledge exists, a summary finding may be justified, but a summary sanction is not. Where both elements co-exist, the judge's personal knowledge justifies summary finding, and the imminent threat justifies summary sanction; no due process hearing is required. In cases of *indirect* contempt, either the *lack* of the judge's personal knowledge or the *absence* of an imminent threat necessitates a trial with due process guarantees.

 Where the contumacious act takes place outside the presence of the judge, it is indirect contempt. *In re Lands, supra,* at 595, 33 O.O. at 83, 67 N.E.2d at 437: "Indirect contempt is one committed outside the presence of the

court, but which also tends to obstruct the due and orderly administration of justice."

Thus, the perplexing question generally is not between direct and indirect contempt, but rather between direct and summary contempt.

The case at bar involves indirect rather than direct contempt or summary contempt, requiring a due process hearing for a finding of contempt and imposition of contempt sanctions.

## Civil and Criminal Contempt

 Contempt of court is classified as (a) civil contempt, and (b) criminal contempt. A civil contempt is one in which the court imposes an indefinite sanction until the contemnor purges himself by performing the act ordered by the court, with the sentence either immediately carried out or deferred pending compliance; its purpose is remedial, to coerce the contemnor to perform, for the benefit of the opposing party. A criminal contempt is one in which the court imposes a definite punitive sentence, for the purpose of punishing the contemnor for defying the court's authority; its purpose is punitive, to uphold the authority of the court and vindicate the law. See Brigner, Contempt Issues, *supra*; NLM Contempt, Chapters VII and VIII.

 The answer to the question "what does the court primarily seek to accomplish by imposing sentence?" will determine whether a contempt is civil or criminal. *Shillitani v. United States* (1966), 384 U.S. 364, 370, 86 S.Ct. 1531, 1535, 16 L.Ed.2d 622, 627. "The important test in determining whether contempt is civil or criminal is the purpose of punishment. If the purpose of the punishment is remedial, intended to bring about performance of the act which the court has commanded for the benefit of the injured party, the contempt is civil, but, if * * * the punishment * * * is punitive so as to vindicate the authority of the court, the contempt is criminal." NLM Contempt, *supra*, at 92. As stated in *Gompers v. Buck's Stove, supra*, at 441, 31 S.Ct. at 498, 55 L.Ed. at 806: "It is not the fact of punishment but rather its character and purpose that often serve to distinguish between the two classes of cases. If it is for civil contempt the punishment is remedial, and for the benefit of the complainant. But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court."

In England, characterization of civil contempt as quasi-criminal has led to the gradual assimilation of the two branches of contempt, marked by application of criminal standards and safeguards to civil contempt proceedings, and essentially the abolition of the distinction. Miller, Contempt of Court, *supra*, at 27–29, 42–44.

The court in *Dayton Women's Health Ctr. v. Enix* (1991), 68 Ohio App.3d 579, 591–592, 589 N.E.2d 121, 129, succinctly spells out the distinction in purpose between civil and criminal contempt: "Sanctions for criminal contempt thus share three traditional characteristics: (1) the sanction is ·a punishment; (2) the sanction is imposed for conduct that has occurred in the past; and (3) the purpose of the sanction is to uphold the authority of the court. Civil contempt produces a remedial sanction, which is one intended to coerce the termination of specific misconduct which constitutes a continuing contempt of court."

The Supreme Court of Ohio comprehensively contrasts the punitive unconditional sanction of criminal contempt with the remedial conditional sanction of civil contempt in *Brown v. Executive, supra*, at 253, 18 O.O.3d at 448–449, 416 N.E.2d at 613: "While both types of contempt contain an element of punishment, courts distinguish criminal and civil contempt not on the basis of punishment, but rather, by the character and purpose of the punishment * * * Punishment is remedial or coercive and for the benefit of the complainant in civil contempt. Prison sentences are conditional. The contemnor is said to carry the keys of his prison in his own pocket * * * since he will be freed if he agrees to do as ordered. Criminal contempt, on the other hand, is usually characterized by an uncondital prison term. Such imprisonment operates not as a remedy coercive in its nature but as punishment for the completed act of disobedience, and to vindicate the authority of the law and court." As noted by the United States Supreme Court in *Hicks v. Feiock* (1988), 485 U.S. 624, 631, 108 S.Ct. 1423, 1429, 99 L.Ed.2d 721, 731: "If [the finding] is for civil contempt the punishment is remedial, and for the benefit of the complainant. But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court."

▮ Contumacious intent is an essential element of criminal contempt. *Midland Steel Prods. Co. v. U.A.W. Local 486* (1991), 61 Ohio St.3d 121, 127, 573 N.E.2d 98, 100: "[I]n cases of criminal, indirect contempt, it must be shown that the alleged contemnor intended to defy the court." The required intent, however, may be proven by circumstantial evidence, *State v. Huffman* (1936), 131 Ohio St. 27, 41, 5 O.O. 325, 331, 1 N.E.2d 313, 319, and may be inferred from the circumstances. *Walker v. Birmingham* (1967), 388 U.S. 307, 312, 87 S.Ct. 1824, 1827, 18 L.Ed.2d 1210, 1215, fn. 4. ("Proof of the elements of criminal contempt may be established by circumstantial evidence."). As noted in *State v. Johnson* (1978), 56 Ohio St.2d 35, 39, 10 O.O.3d 78, 80, 381 N.E.2d 637, 640: "It is a fundamental principle that a person is presumed to intend the natural, reasonable and probable consequences of his voluntary acts."

▮ Contumacious intent is not an essential element of civil contempt. *Windham Bank v. Tomaszczyk, supra*, at 58, 56 O.O.2d at 32, 271 N.E.2d at 817: "[P]roof of intent is not required in civil contempt;" *Pugh v. Pugh* (1984), 15 Ohio

St.3d 136, 140, 15 OBR 285, 287–288, 472 N.E.2d 1085, 1088–1089. As declared by the United States Supreme Court in *McComb v. Jacksonville* (1949), 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599, 604: "The absence of willfulness does not relieve from civil contempt. * * * Since the purpose is remedial it matters not with what intent the defendant did the prohibited act. * * * An act does not cease to be a violation of law and of a decree merely because it may have been done innocently."

Despite the fact the primary purpose of criminal contempt is to vindicate the court's authority, the unconditional element of criminal contempt is not so inflexible that the sanction may not provide for suspension conditioned upon future conduct, *James v. James* (Apr. 21, 1999), Wayne App. No. 98CA0016, unreported, 1999 WL 247320, or earlier termination conditioned upon compliance with the court order. *State v. Kilbane* (1980) 61 Ohio St.2d 201, 207, 15 O.O.3d 221, 224–225, 400 N.E.2d 386, 391. Conversely, a suspended indefinite civil sanction may become definite upon revocation of the suspension for further violations. *Jencks v. Goforth* (1953), 57 N.M. 627, 633–634, 261 P.2d 655, 659–662; *Local 890 of Internatl. Union of Mine, Mill & Smelter Workers v. New Jersey Zinc Co.* (1954), 58 N.M. 416, 272 P.2d 322, headnote two. Although historically suspended conditional sentences have been commonplace in criminal law, when applied to the law of contempt, such sentences give rise to the dilemma that their obvious purpose is not to vindicate the law as is the purpose of criminal contempt, but rather is coercive as is the purpose of civil contempt. Dudley (1993), 79 Va.L.Rev. 1025, at 1049–1052.

It is well settled that the same act may constitute both civil and criminal contempt, and a civil sanction of an indefinite commitment until the ordered act is performed may be combined with a criminal sanction of a definite fine and/or jail sentence for violation of the order. *Hicks v. Feiock, supra,* at 631, 108 S.Ct. at 1429, 99 L.Ed.2d at 731; *Cincinnati v. Council, supra,* at 206, 64 O.O.2d at 134–135, 299 N.E.2d at 693–694; *Brown v. Executive, supra,* at 253, 18 O.O.3d at 448–449, 416 N.E.2d at 612–613. These combined sanctions do not raise any double jeopardy problems. *Yates v. United States* (1957) 355 U.S. 66, 78 S.Ct. 128, 2 L.Ed.2d 95. Both civil and criminal contempt may be considered in the same hearing, and civil sanctions may be used to coerce compliance with the court order "and to compensate the complainant for losses sustained." *United States v. United Mine Workers* (1947), 330 U.S. 258, 299, 303–304, 67 S.Ct. 677, 698–699, 701–702, 91 L.Ed. 884, 915–916, 917–919. See 85 A.L.R.3d 895. It has been pointed out, however, that a single trial for civil and criminal contempt can raise serious due process issues. "[J]oint trials [of civil and criminal contempt] entail problems and hazards that lead us to think it would usually be wiser to try the civil and criminal charges separately. There are many

safeguards applicable in a criminal contempt proceeding * * * which do not apply in a civil contempt proceeding. These differences create unforeseen problems when civil and criminal contempt charges are tried jointly." *United States v. Rylander* (C.A.9, 1983), 714 F.2d 996, 1004. See *Young v. United States* (1987), 481 U.S. 787, 107 S.Ct. 2124, 95 L.Ed.2d 740.

█ Inability to pay child support or spousal support is an affirmative defense in a civil contempt action that must be raised and proven by the accused contemnor. *United States v. Rylander* (1983), 460 U.S. 752, 757, 103 S.Ct. 1548, 1552–1553, 75 L.Ed.2d 521, 528; *Cook v. Cook* (1902), 66 Ohio St. 566, 64 N.E. 567, paragraph one of the syllabus; *In re Purola* (1991), 73 Ohio App.3d 306, 313, 596 N.E.2d 1140, 1144–1145; *Courtney v. Courtney, supra,* at 334, 16 OBR at 383, 475 N.E.2d at 1290: "It is well established in the law of Ohio, as well as other jurisdictions, that a person charged with contempt for the violation of a court order may defend by proving that it was not in his power to obey the order." See 53 A.L.R.2d 591. Substantial compliance may be a defense in a proper case. *State v. Crites* (1891), 48 Ohio St. 460, 28 N.E. 178; *State v. Bd. of Edn.* (1980), 61 Ohio St.2d 314, 15 O.O.3d 387, 401 N.E.2d 925.

█ A criminal contempt action is to be distinguished from criminal charges for the same act prosecuted in criminal court. *State v. Oppenheimer* (1975), 46 Ohio App.2d 241, 75 O.O.2d 404, 348 N.E.2d 731. The fact that a contumacious act also constitutes a crime does not prevent the court from acting on the contempt charge. *Hale v. State, supra,* at 214–215, 45 N.E. at 200; *State v. Johnson* (1908), 77 Ohio St. 461, 83 N.E. 702, paragraph one of the syllabus; *State v. Jones* (June 19, 1995), Clermont App. No. CA94–11–094, unreported, 1995 WL 367197; *State v. Rogers* (Dec. 23, 1994), Lake App. No. 93–L–180, unreported, 1994 WL 738447 (each offense requires proof of different elements). See R.C. 2919.21.

It is not uncommon for a contemnor to face separate criminal charges for essentially the same behavior for which he had been convicted for criminal contempt, without state or federal prohibitions against double jeopardy acting as a bar to prosecution. The basis of this rule, the "Blockberger" or "same elements" test, has recently been affirmed by the Supreme Court of the United States in *United States v. Dixon* (1993), 509 U.S. 688, 113 S.Ct. 2849, 125 L.Ed.2d 556 overruling its 1,000–day–old holding in *Grady v. Corbin* (1990), 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548. The same-elements test holds that the prohibition against double jeopardy does not apply where there are two distinct offenses and each offense "requires proof of an additional fact which the other does not." *Blockburger v. United States* (1932) 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306, 309. Immediately before *Dixon,* the due process right to be free from "having to run the gauntlet a second time," *Ashe v. Swenson* (1970), 397

U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469, headnote nine, had crystallized with an additional "collateral estoppel" test to make such charges less likely today. See *Grady v. Corbin, supra; Menna v. New York* (1975), 423 U.S. 61, 96 S.Ct. 241, 46 L.Ed.2d 195; *State v. Tolbert* (Apr. 4, 1990), Hamilton App. No. C–890148, unreported, 1990 WL 37785; and *State v. Vanselow* (1991), 61 Ohio Misc.2d 1, 572 N.E.2d 269 (comprehensive analysis of modern double jeopardy law between *Grady* and *Dixon*). Contempt proceedings characterized as civil albeit criminal in substance may be protected by the Double Jeopardy Clause. As stated in *United States v. Halper* (1989), 490 U.S. 435, 448–449, 109 S.Ct. 1892, 1902, 104 L.Ed.2d 487, 502: "We therefore hold that under the Double Jeopardy Clause a defendant who already has been punished in a criminal prosecution may not be subjected to an additional civil sanction to the extent that the second sanction may not fairly be characterized as remedial, but only as a deterrent or retribution." See 26 A.L.R.4th 950.

▆▆ Almost a century ago, it was aptly stated in *In re Nevitt* (C.A.8, 1902), 117 F. 448, 461, that contemnors "carry the keys of their prison in their own pockets." This notion refers to the fact that the civil contemnor, unlike the criminal contemnor, must be allowed the opportunity to purge. *State v. Kilbane* (1980), 61 Ohio St.2d 201, 206–207, 15 O.O.3d 221, 224–225, 400 N.E.2d 386, 390–391; *Carroll v. Detty* (1996), 113 Ohio App.3d 708, 710, 681 N.E.2d 1383, 1383–1384. The court has absolute control over its previous contempt orders to modify or vacate them, *Juv. Protective Assoc. v. Roebling* (1916), 18 Ohio N.P. N.S. 385, 386–387, 26 Ohio Dec. 219, 1916 WL 1368 (otherwise contemnor "would be constrained to remain in jail forever"), and may suspend sentence to allow the opportunity to purge. *Turner v. Bremen* (1928), 118 Ohio St. 639, 640, 163 N.E. 302. Once the civil contemnor performs the court-ordered act, the purpose of the sanction has been achieved and it is discontinued. *Cleveland v. Ramsey* (1988), 56 Ohio App.3d 108, 110, 564 N.E.2d 1089, 1091–1092; NLM Contempt, *supra,* Chapter XV.

Contrary to defendant's argument in *United States v. Shipp* (1906), 203 U.S. 563, 568, 27 S.Ct. 165, 51 L.Ed. 319 ("It is not necessary to go into the confusions and distinctions between direct and constructive, remedial and punitive contempts and the other classifications. This was aggravated, and that is enough."), the significance of a court being explicit in its rulings, especially delineating between criminal and civil contempt, cannot be overstated, because criminal sanctions give rise to constitutional protections. *In re Oliver, supra; Hicks v. Feiock, supra.*

The case before the court involves both civil and criminal contempt.

## Contempt Statutes

The Ohio legislature has supplemented the inherent contempt power of Ohio courts with Ohio Revised Code Chapter 2705 (Contempt of Court), enacted in

1834 and virtually unchanged to this day. It has also enacted more than one hundred additional statutes regarding contempts of all three branches of government. See Judge Michael R. Merz, Ohio Judicial College Contempt Seminar 2000, at 20–32. These statutes neither create nor limit the contempt power of the courts of Ohio. "Usually, statutory [contempt] provisions * * * are merely declaratory of the common law." NLM Contempt, *supra*, at 10.

Although R.C. Chapter 2705 incorporates constitutional due process safeguards under which the indirect contempt power may be exercised, it cannot and does not limit the inherent contempt power of Ohio courts. *Atty. Gen. v. Albin*, *supra*, at paragraph two of the syllabus; *Zakany v. Zakany*, *supra*, at 194, 9 OBR at 507, 459 N.E.2d at 872–873; *Cincinnati v. Council*, *supra*, at 207, 64 O.O.2d at 135, 299 N.E.2d at 694; *McDaniel v. McDaniel* (1991), 74 Ohio App.3d 577, 579, 599 N.E.2d 758, 759–760; *Olmsted Twp. v. Riolo* (1988), 49 Ohio App.3d 114, 116–117, 550 N.E.2d 507, 509–510; *Beach v. Beach*, *supra*, at paragraph three of the syllabus. As voiced by the Supreme Court of Ohio in *Atty. Gen. v. Albin*, *supra*, at 531, 161 N.E. at 793: "The accepted doctrine is that statutes pertaining to contempt of court merely regulate the power of the court to punish for contempt, instead of creating the power." As plainly declared by the Ohio Supreme Court in the seminal case of *Hale v. State*, *supra*, at 215, 45 N.E. at 200:

"[T]he [contempt] power inheres in courts independently of legislative authority. A power which the legislature does not give, it cannot take away." (Emphasis added.)

As noted above, definition and penalty standards of federal contempt law are set by statute, Section 401, Title 18, U.S.Code; Fed.Crim.R. 42(a), although federal and Ohio share due process standards under the federal and state Constitutions.

R.C. 2705.01 (Summary Punishment for Contempt) codifies summary contempt as it existed at common law: "[A] court, or judge at chambers, may summarily punish a person guilty of misbehavior in the presence of or so near the court or judge as to obstruct the administration of justice." *State v. Union*, *supra*, at 79, 15 O.O.2d at 136, 173 N.E.2d at 335–336.

R.C. 2705.02 to 2705.10 address indirect contempt matters, including (some) acts of contempt, due process procedures, and (legislative recommended) penalties. As noted above, these statutes do not place any limitations upon courts' inherent power regarding acts that constitute contempt or penalties for contempt.

R.C. 2705.06 echoes the conditional element of the court's inherent authority regarding imprisonment for civil contempt: "When the contempt consists of the omission to do an act which the accused can yet perform, he may be imprisoned until he performs it." Coercive imprisonment for civil contempt may last only so

long as compliance with the court order is possible. *Shillitani v. United States* (1966) 384 U.S. 364, 370, 86 S.Ct. 1531, 1535–1536, 16 L.Ed.2d 622, 627; *State v. Kilbane* (1980), 61 Ohio St.2d 201, 206, 15 O.O.3d 221, 224, 400 N.E.2d 386, 390–391.

 R.C. 2705.031 addresses the procedure for a contempt action against a parent for failure to pay child support. The imposition of a jail sentence for failure to pay child support or spousal support does not constitute imprisonment for a "debt" contrary to, Section 15, Article I of the Constitution of Ohio. *Cramer v. Petrie, supra,* at 136, 637 N.E.2d 882 (child support); *Ex parte Frisbie* (1927), 27 Ohio App. 290, 161 N.E. 346, paragraph one of the syllabus (spousal support); *Cook v. Cook* (1902), 66 Ohio St. 566, 64 N.E. 567, paragraph two of the syllabus (spousal support). See 30 A.L.R. 130.

"The juvenile court has the same jurisdiction in contempt as courts of common pleas." R.C. 2151.21. Municipal courts have inherent and statutory authority to punish for contempts. R.C. 1901.13; *State v. Johnson* (1987), 34 Ohio App.3d 373, 518 N.E.2d 974; *In re Sherlock* (1987), 37 Ohio App.3d 204, 525 N.E.2d 512. Since 1990, mayors' courts have the same contempt powers as do county courts. R.C. 1905.28. Since 1992, county courts have statutory as well as inherent power to punish for contempts. R.C. 1907.18(B), superseding *Johnson v. Perry Cty. Court* (1986), 25 Ohio St.3d 53, 25 OBR 77, 495 N.E.2d 16. Ohio magistrates have power to punish for contempt committed in their actual presence, with right of bail or immediate review. Civ.R. 53; Juv.R. 40. See Fed.Crim.R. 42.

The case at bar involves contempt statutes only to the extent that the court adheres to due process protections incorporated therein.

### Contempt Sanctions

 Although R.C. 2705.05 sets forth sanctions for indirect contempt, due to their inherent contempt authority, Ohio courts may impose sanctions "without regard" to statutory penalties. *Olmsted Twp. v. Riolo, supra,* at paragraph one of the syllabus. The Ohio Supreme Court remarked in *Cincinnati v. Council, supra,* at 207, 64 O.O.2d at 135, 299 N.E.2d at 694: "It is * * * highly doubtful that the General Assembly may properly limit the power of a court to punish for contempt." As noted in *McDaniel v. McDaniel, supra,* at paragraph one of the headnotes: "Court may, pursuant to its inherent powers, punish contemptuous refusal to comply with its orders without regard to statutory penalties."

The Ohio Supreme Court set a general standard for contempt sanctions in *Atty. Gen. v. Albin, supra,* at paragraph one of the syllabus: "Upon the punishment of persons adjudged guilty of contempt, the courts have inherent power to impose a penalty reasonably commensurate with the gravity of the offense." In *United States v. United Mine Workers, supra,* at 303–304, 67 S.Ct.

at 702, 91 L.Ed. at 918–919, the Supreme Court of the United States established a more specific standard: "In imposing a fine for criminal contempt, the trial judge may properly take into consideration the extent of the willful and deliberate defiance of the court's order, the seriousness of the consequences of the contumacious behavior, the necessity of effectively terminating the defendant's defiance as required by the public interest, and the importance of deterring such acts in the future. Because of the nature of these standards, great reliance must be placed upon the discretion of the trial judge." In imposing a fine for civil contempt, where the purpose is to effect compliance, the court should "consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired."

 Contempt sanctions can be substantial, although subject to strict scrutiny upon review. Separate fines may be levied for each day a court order is violated. *New Jersey v. New York* (1933), 290 U.S. 237, 240, 54 S.Ct. 136, 137, 78 L.Ed. 291, 293 ($5,000 daily fine to be paid by defendant to plaintiff for continuing noncompliance with order). *In re Dellinger; United States v. Seale*, No. 69 CR 180 (ND Ill.1970); *United States v. Seale* (1972), 461 F.2d 345; *In re Dellinger* (1972), 461 F.2d 389, and (1973), 357 F.Supp. 949, affirmed (1974), 502 F.2d 813, certiorari denied (1975), 420 U.S. 990, 95 S.Ct. 1425, 43 L.Ed.2d 671 ("*Chicago Seven Conspiracy*" trial, where some 175 separate contempt citations had been recorded against the defendants and their counsel by the end of trial, reversed upon grounds Judge Julius Hoffman should have disqualified himself and he could not impose aggregate sentences in excess of six months without affording an opportunity for a jury trial); *United States v. IBM* (S.D.N.Y.1973), 60 F.R.D. 658, 667 (one million + dollars a week sanction to compel discovery); *United States v. Leyva* (C.A.5, 1975), 513 F.2d 774, 780 (original thirty-five-year contempt sentence reduced to two years); *In re Papadakis* (S.D.N.Y.1985), 613 F.Supp. 109 (ten-year civil contempt sanction for refusal to testify under grant of immunity); *Renz v. Renz* (Jan. 19, 1995), Athens App. No. 93CA1585, unreported, 1995 WL 23365 ($73,500 cumulative fine for continuing ten-month violation of child visitation order).

 The court has discretion to award attorney fees in contempt proceedings. *State ex rel. Fraternal Order of Police v. Dayton* (1977), 49 Ohio St.2d 219, 230, 3 O.O.3d 360, 365–366, 361 N.E.2d 428, 436; *Planned Parenthood v. Project Jericho* (1990), 52 Ohio St.3d 56, 67, 556 N.E.2d 157, 168: "A trial court may, within its discretion, include attorney fees as part of the costs taxable to a defendant found guilty of civil contempt." See 43 A.L.R.3d 793. Delayed compliance with a court order, even where compliance is effected before a hearing on a contempt motion, does not prevent sanctions or an award of attorney's fees.

*Walton v. Davis* (June 26, 1997), Franklin App. No. 96APF11–1503, unreported, 1997 WL 358860. The rationale for a finding of contempt and imposition of sanctions, despite the contemnor's compliance before the contempt hearing, is that the finding and sanction serve the purpose of securing "the dignity of the courts and the uninterrupted and unimpeded administration of justice." *Windham Bank, supra*, at 58, 56 O.O.2d at 32, 271 N.E.2d at 817. See *Roach v. Roach* (1989), 61 Ohio App.3d 315, 572 N.E.2d 772, and *Morford v. Morford* (1993), 85 Ohio App.3d 50, 619 N.E.2d 71. Additionally, civil content sanctions may be imposed either to "enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance." *McComb v. Jacksonville Paper, supra*, at 191, 69 S.Ct. at 499, 93 L.Ed. at 604. Attorney fees may be awarded in a contempt proceeding even where there is no finding of contempt. *Donese v. Donese* (Sept. 29, 2000), Greene App. No. 2000–CA–17, unreported; *Cattren v. Cattren* (1992), 83 Ohio App.3d 111, 614 N.E.2d 770; *Saeks v. Saeks* (1985), 24 Ohio App.3d 67, 24 OBR 122, 493 N.E.2d 280. See R.C. 3105.18(H).

The standard for an award of attorney fees was set by the Cuyahoga County Court of Appeals in *Swanson v. Swanson* (1976), 48 Ohio App.2d 85, 2 O.O.3d 65, 355 N.E.2d 894. The Ohio Revised Code specifies *mandatory* attorney fees against contemnors in certain domestic relations court contempt orders, including spousal support (R.C. 3105.18[G]), child support (R.C. 3105.21[C]), domestic violence case child support (R.C. 3113.31[K]), and visitation (R.C. 3109.051[K]). *In re Yeauger* (1992), 83 Ohio App.3d 493, 615 N.E.2d 289.

 Sanctions for contempt are imposed in the discretion of the court within the proper exercise of its inherent power of contempt. The Supreme Court of the United States has declared that "great reliance must be placed upon the discretion of the trial judge." *United States v. United Mine Workers, supra*, at 303. It has also been held that a judgment of contempt "should not be disturbed except in case of a clear miscarriage of justice." *Conley v. United States* (1932), 59 F.2d 929, 936. A reviewing court is not free to merely substitute its judgment for that of the trial court. *Berk v. Matthews* (1990), 53 Ohio St.3d 161, 169, 559 N.E.2d 1301, 1308–1309; *In re Jane Doe 1* (1991) 57 Ohio St.3d 135, 138, 566 N.E.2d 1181, 1184–1185. The standard for reversal of a contempt finding is "abuse of discretion." *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 172–173, 404 N.E.2d 144, 148–149; *Blakemore v. Blakemore* (1983) 5 Ohio St.3d 217, 218–219, 5 OBR 481, 481–482, 450 N.E.2d 1140, 1141–1142. As set forth by the Ohio Supreme Court in *State v. Birkel* (1981), 65 Ohio St.2d 10, 19 O.O.3d 191, 417 N.E.2d 1249: "This court will not reverse decision of the court below in a contempt proceeding in the absence of a showing of an abuse of discretion." In *State v. Adams, supra*, at 157, 16 O.O.3d at 173, 404 N.E.2d at

149, the Ohio Supreme Court composed the following definition: "The term 'abuse of discretion' connotes more than error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable." The definition of "abuse of discretion" is in the disjunctive ("or"). Most abuses of discretion are simply unreasonable rather than arbitrary or unconscionable, and a decision is "unreasonable" where there is "no sound reasoning process" supporting it. *AAAA Ent., Inc. v. River Place Community Urban Redev. Corp.* (1990) 50 Ohio St.3d 157, 161, 553 N.E.2d 597, 600–601.

Regarding the discretion of the trial court, it should be noted that contrary to the usual rule on appeal, "[t]he general rule in cases of direct contempt is that the trial court's judgment or order of direct contempt must itself contain a complete and clear statement of the facts upon which the conviction is based." *State v. Treon, supra,* at 242, 188 N.E.2d at 316. *Cleveland Hts. v. Veasley* (Cuyahoga Cty.), 1978 Ohio App. LEXIS 8434.[2] The guilt of a person accused of contempt must be shown affirmatively in the record.

In the case under consideration, the court has the authority and discretion to impose the legislatively recommended sanctions contained within the statutes, or impose sanctions without regard to the statutes.

---

**2.** Numerous summary contempt cases, primarily involving legal counsel, have been reversed for failure of the trial court to set forth the facts that constitute the accused contempt "fully, clearly, and specifically" in its judgment or order. *Treon, supra; White v. Kiraly* (Cuyahoga App.1975), 1975 Ohio App. LEXIS 6206 ("This court has consistently held that the failure to 'enter a written order, setting forth fully, clearly, and specifically the facts out of which the contempt arose * * * constitutes reversible error.' "); *State v. Butler* (Cuyahoga App.1976), 1976 Ohio App. LEXIS 7467 (clear duty of trial court to set forth the facts constituting direct contempt "fully, clearly, and specifically"); *Cleveland Hts. v. Veasley* (Cuyahoga App.1978), 1978 Ohio App. LEXIS 8434 ("The record is devoid of any reference to the contempt conviction except for the entry sentencing the appellant to ten days. It is impossible to determine the nature of the contempt charge against the appellant from the official papers and court records. The general rule in cases of direct contempt committed in the presence of the court is that the court's judgment or order of contempt must itself contain a complete and clear statement of the facts upon which the conviction is based. The guilt of a person accused of contempt must be shown affirmatively in the record."); *State v. Sindell* (Lorain App.1978), 1978 Ohio App. LEXIS 8236 ("We cannot review this order. A direct contempt order must contain a clear and complete recital of the facts upon which the finding is based to allow an appellate court to judge its lawfulness."); *Washington v. Gregory* (Feb. 19, 1985), Clinton App. No. CA84–06–022, unreported, 1985 WL 8179 ("An appellate court may not assume a lower court's finding of contempt was correct. Thus, when entering its finding of contempt, a trial court must [clearly and specifically] set forth in its written order the facts from which the contempt arose."); *State v. Moll* (Jan. 10, 1992), Wood App. No. 91WD010, unreported, 1992 WL 2539 ("The guilt of a person accused of contempt must be shown affirmatively in the record before reviewing court may affirm. This is contrary to the usual rule on appeal."); *State v. Henderson* (Nov. 23, 1993), Shelby App. No. 17–93–11, unreported, 1993 WL 484206 ("[A] reviewing court cannot affirm unless the guilt of the person accused of contempt is affirmatively shown in the record."). See 154 A.L.R. 1227.

Some sanctions for direct contempt are more summary than others. *Anonymous* (1631), 73 Eng.Rep. 416 ("[The prisoner] threw a brickbat at the said Judge, which nearly missed; and for this an indictment was immediately drawn by Noy against the prisoner, and his right hand cut off and fixed to the gibbet, upon which he was himself immediately hanged in the presence of the Court.").

### Judicial Immunity and Disciplinary Proceedings Regarding Contempt

Over the many years of the instant domestic relations case, Caron filed a series of separate civil actions and grievances requesting that disciplinary charges be brought against the judges who were assigned the responsibility of ruling on the superflux of motions filed by him.

The doctrine of judicial immunity, honored in English and American law for almost four centuries, decrees that the "judicial acts" of a judge are not a proper subject of inquiry, and grants immunity from civil suits for all judicial acts. *Floyd v. Barker* (Star Chamber 1607), 77 Eng.Rep. 1306; *Wilkes v. Dinsman* (1848), 48 U.S. (7 How.) 89, 12 L.Ed. 618. It is axiomatic that an independent and vigorous judiciary is essential as a bulwark to protect the rights of our citizens. The Founding Fathers declared that "[t]he complete independence of the courts of justice is peculiarly essential in a limited Constitution." Hamilton, The Federalist, No. 78. The overriding societal interest underlying the doctrine of judicial immunity, even for insidious judicial acts, is the paramount public interest in judicial independence. Chief Justice Warren, in *Pierson v. Ray* (1967), 386 U.S. 547, 554, 87 S.Ct. 1213, 1217–1218, 18 L.Ed.2d 288, 294–295, citing *Scott v. Standfield* (1868), 37 L.J.Ex. 155, 156–157, declared that *judicial immunity "is not for the protection or benefit of a malicious or corrupt judge, but for the benefit of the public,* whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences." (emphasis added.)

"The theory of judicial independence * * * is recognized in every civilized country." Yardley, English Courts of Law (1979) (Oxford Univ. Press), at 126. Any infringement on the independence of the judiciary is an immediate threat to the fundamental concept of a free society and government under law. The Supreme Court of the United States in *Bradley v. Fisher* (1871), 80 U.S. (13 Wall.) 335, 347, 20 L.Ed. 646, 649, underscored the public policy interest protected by judicial immunity when it decreed that it is a "general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, [should] be free to act upon his own convictions, without apprehension of personal consequences to himself."

 Judicial immunity is absolute—suit will not lie even if the judicial acts are corrupt or made for purely malicious reasons. *Bradley v. Fisher, supra,* at

353, 20 L.Ed. at 651; *Pierson v. Ray, supra,* at 554, 87 S.Ct. at 1217–1218, 18 L.Ed.2d at 294–295. The doctrine of judicial immunity is so solidified in law that the issue whether the acts complained of constitute "judicial acts" is a threshold issue that must be resolved before any legal action beyond filing suit, including discovery, is permitted. *Harlow v. Fitzgerald* (1982), 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396, 411: "Until this threshold immunity question is resolved, discovery should not be allowed"; *Elliott v. Perez* (1985), 751 F.2d 1472, 1478.

The same public purpose rationale underlying the doctrine of judicial immunity is specified as a cautionary mandate in *the preamble to the Ohio Code of Judicial Conduct, charging that the Code "be construed so as not to impinge on the essential independence of Judges in making judicial decisions."* This is not to say that judges are absolutely immune from disciplinary proceedings as they are from civil suit, regarding their contempt decisions. See Annotation, "Abuse or Misuse of Contempt Power as Ground for Removal or Discipline of Judge," 76 A.L.R.4th 982. *Discipline cases, however, effectively grant qualified immunity to judges regarding their judicial decisions, including those for contempt. They do so by requiring a "pervasive course" of egregious judicial contempt decisions motivated by a "malicious or corrupt purpose" to establish judicial misconduct. Geiler v. Comm. on Judicial Qualifications* (1973), 10 Cal.3d 270, 286, 110 Cal.Rptr. 201, 211, 515 P.2d 1, 11 ("pervasive course of conduct"); *Gubler v. Comm. on Judicial Performance* (1984), 37 Cal.3d 27, 207 Cal.Rptr. 171, 688 P.2d 551, headnote five ("Bad faith, for purposes of judicial misconduct, requires a malicious or corrupt purpose."); *Spruance v. Comm. on Judicial Qualifications* (1975), 13 Cal.3d 778, 795–796, 119 Cal.Rptr. 841, 853, 532 P.2d 1209, 1221 ("[W]ilful misconduct * * * entails actual malice * * *; 'bad faith' is quintessentially a concept of specific intent, requiring consciousness of purpose as an antecedent to a judge's acting maliciously or corruptly"); *Furey v. Comm. on Judicial Performance* (1987), 43 Cal.3d 1297, 1305, 240 Cal.Rptr. 859, 861, 743 P.2d 919, 921 ("malice includes * * * improper purpose"); *McCartney v. Comm. on Judicial Qualifications* (1974), 12 Cal.3d 512, 116 Cal.Rptr. 260, 526 P.2d 268.

The power of contempt is the sole means by which judges can enforce their orders for the benefit of the public, and it may constitute a violation of their sworn duty to fail to exercise it where appropriate. The contempt power "is absolutely essential to the performance of the duties imposed on [courts] by law." *Gompers v. Buck's Stove, supra,* at 450, 31 S.Ct. at 501, 55 L.Ed. at 809. "'That [contempt] power has been vested in the judges, not for their personal protection, but for that of the public. *And a judge will depart from his bounden duty if he forebears to use it when occasions arise which call for its exercise.'"* (Emphasis added.) *Ex parte Terry, supra,* at 308, 9 S.Ct. at 81, 32 L.Ed. at 410, quoting

*Rex v. Davidson* (1970), 4 B. & Ald. 329, 333. It is said that the independence of judges is threatened and public policy is thwarted if they must decide cases in the shadow of a judicial conduct organization poised to take action against them should their decisions be deemed erroneous or unjustified, and that judicial discipline should be used rarely, if at all, regarding a judge's judicial decisions, including those for contempt. 2000 Bench–Bar Conference—Defending Justice: The Courts, Criticism, and Intimidation, an Excerpt from the Constitutional Project: The Report of the Task Force of Citizens for Independent Courts Uncertain Justice, at 151–152.

Caron's legal actions, affidavits of prejudice, and requests for disciplinary action against the judges in this case, after due consideration by the respective authorities, were summarily dismissed as frivolous.

## Due Process Safeguards in Indirect Contempt Proceedings

Indirect contempt law has escaped the controversy and confusion that has engulfed direct contempt and summary contempt law for the past several centuries, because by definition indirect findings and sanctions are preceded by a legal proceeding in which facts and issues are determined, with the accused contemnor afforded a multitude of constitutional due process rights.

Due process of law, the "law of the land," applies to the law of contempt of court. Many protections found in the Bill of Rights, including the guarantee of due process of law of the Fifth Amendment, can ultimately be traced back to the Magna Carta (King John's Charter of 1215/1225): "These are the particulars of what the Barons petition, and our Lord the king grants: XXIX. No Free-man's body shall be taken, nor imprisoned, nor disseised, nor outlawed, nor banished, nor in any ways be damaged, nor shall the king send him to prison by force, excepting by the judgment of his Peers and by the Law of the land." Thompson, An Historical Essay on the Magna Charta of King John (1982) (The Legal Classics Library), at 55.

Mindful of the homily of the Supreme Court of the United States that "the provisions of the Constitution * * * are organic living institutions transplanted from English soil," *Gompers, supra,* at 610, I turn now to the all-important due process substantive and procedural aspects of contempt of court. It constitutes due process of law for the court to make a *summary finding* of contempt and impose a *summary sanction* for contempt, where the judge has *personal knowledge* of the contumacious act, and the act constitutes an *imminent threat* to the administration of justice. *Cooke v. United States, supra,* at 534, 45 S.Ct. at 394, 69 L.Ed. at 772–773; *In re Oliver, supra,* at 274–276, 68 S.Ct. at 508–509, 92 L.Ed. at 694–695. In such circumstances, the judge may act summarily by dispensing with a hearing, provided the judge recites facts on the

record personally known to the judge and essential to a finding of summary contempt. *State v. Treon, supra,* at 242, 188 N.E.2d at 315; *Massillon v. Litty* (Nov. 17, 1982), Stark App. No. 5961, unreported, 1982 WL 5550.

■ Where the judge *lacks personal knowledge* of the alleged act of contempt, or where there is *an absence of an immediate threat* to the administration of justice, however, any contempt is *indirect contempt* and the accused contemnor is entitled under the Fourteenth Amendment to the Bill of Rights of the Constitution of the United States and the Constitution of the state of Ohio, to a hearing that incorporates the guarantees of due process of law. *Gompers v. Buck's Stove & Range Co.* (1911), 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797; *Cooke v. United States* (1925), 267 U.S. 517, 45 S.Ct. 390, 69 L.Ed. 767; *In re Oliver* (1948), 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682; *Argersinger v. Hamlin* (1972), 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530; *Hicks v. Feiock* (1988), 485 U.S. 624, 108 S.Ct. 1423, 99 L.Ed.2d 721; *In re Neff* (1969), 20 Ohio App.2d 213, 49 O.O.2d 312, 254 N.E.2d 25; *In re Parker* (1995), 105 Ohio App.3d 31, 663 N.E.2d 671.

■ Because contempt proceedings affect personal liberty, the proceedings and due process safeguards governing them must be strictly construed. *White v. Gates* (1884), 42 Ohio St. 109, 112, 1884 WL 210; *Second Nat. Bank v. Becker* (1900), 62 Ohio St. 289, 296, 56 N.E. 1025, 1028; *Haas v. Jennings* (1929), 120 Ohio St. 370, 378, 166 N.E. 357, 359. "The charge, the findings, and the judgment of the court thereon are to be construed strictly in favor of the accused." NLM Contempt, *supra,* at 15.

■ Where incarceration is a possible sanction for indirect contempt, criminal or civil, the accused contemnor generally has the rights of a criminal defendant. *Hicks v. Feiock, supra,* headnote one; *In re Neff, supra,* syllabus; *Dayton Women's Health Ctr., supra,* at paragraph nine of the syllabus; *In re Parker, supra,* at 35, 663 N.E.2d at 674.

■ Due process safeguards in indirect criminal contempt proceedings include (1) the right to notice of the charge, (2) the right to service of notice, (3) the right to bail, (4) the right to counsel, (5) the right to sufficient time to prepare defense, (6) the right to be present at trial, (7) the right to a public trial, (8) the right to a speedy trial, (9) the (qualified) right to a jury trial, (10) the right to an impartial judge, (11) the right to call and subpoena witnesses, (12) the right to cross examine adverse witnesses, (13) the right to the presumption of innocence, (14) the right to invoke the privilege against self-incrimination, (15) the right to the proper standard of proof, and (16) the right to appeal.

## Due Process: (1) Right to Notice

■ An accused contemnor has the due process right to notice of the contempt charge and its underlying factual basis. United States Constitution, Bill of Rights, Amendment VI ("In all criminal prosecutions, the accused shall * * * be informed of the nature and cause of the accusation"); Ohio Constitution, Bill of Rights, Section 10, Article I ("In any trial, in any court, the party accused shall be allowed * * * to demand the nature and cause of the accusation against him, and to have a coy thereof."); *Cooke, supra,* at 537, 538, 45 S.Ct. at 395, 69 L.Ed. at 774: "Due process of law * * * requires that the accused should be advised of the charges * * *. The rule should [contain] enough to inform the defendant of the nature of the contempt charged;" *In re Oliver, supra,* at 273, 68 S.Ct. at 499, 507, 92 L.Ed. at 682, 694: "A person's right to reasonable notice of a charge against him * * * [is] basic to our system of jurisprudence"; *Argersinger v. Hamlin, supra,* at 33, 92 S.Ct. at 2010–2011, 32 L.Ed.2d at 536; *In re Neff, supra,* at 224, 49 O.O.2d at 318–319, 254 N.E.2d at 33 (due process "requires that one charged with contempt of court be advised of the charges against him"); *Cincinnati v. Council, supra,* at 203, 64 O.O.2d at 132–133, 299 N.E.2d at 692 (purpose of notice is to apprise accused of charges so he is able to prepare defense).

■ As noted in NLM Contempt, *supra,* at 225: "In an indirect contempt proceeding, the party alleged to be guilty is entitled to have served upon him a rule, which must specify when and where the contempt was committed, with such reasonable certainty as to inform him of the nature and circumstances of the charge and it must set out the facts constituting the contempt." In *McGill v. McGill* (1982), 3 Ohio App.3d 455, 457, 3 OBR 535, 537–538, 445 N.E.2d 1163, 1166, the court points out: "Clearly, an individual subject to contempt proceedings is entitled to adequate notice. * * * Where the notice is sufficient to apprise a party of the charges against her, thereby enabling her to prepare her defense, such notice generally will withstand objections as to content." See R.C. 2705.03 and 2705.031 (special statutory notice required for child support contempt action). See 60 A.L.R.2d 1244 and 76 A.L.R.Fed. 797.

## Due Process: (2) Right to Service of Notice

■ An accused contemnor has the due process right to service of notice of the contempt charge. United States Constitution, Bill of Rights, Amendment VI ("In all criminal prosecutions, the accused shall * * * be informed of the nature and cause of the accusation."); Ohio Constitution, Bill of Rights, Section 10, Article I ("In any trial, in any court, the party accused shall be allowed to * * * demand the nature and cause of the accusation against him, and to have a copy thereof * * *."); *Cooke v. United States, supra,* at 537, 538, 45 S.Ct. at 395, 69

L.Ed. at 774–775 ("Due process of law * * * requires that the accused should be advised of the charges * * *. The rule should have contained enough to inform the defendant of the nature of the contempt charged."); *Argersinger v. Hamlin, supra,* at 28, 92 S.Ct. at 2007, 32 L.Ed.2d at 533: "Another guarantee is the right to be informed of the nature and cause of the accusation"; *State v. Local Union, supra,* at 87, 173 N.E.2d 331 (contemnor must "have notice of such order [to show cause] either actual or by service of the same upon him").

There is disagreement among the courts regarding the technical requirements of service of notice of contempt charges. *McWhorter v. Curran* (1935), 57 Ohio App. 233, 244, 10 O.O. 419, 423, 13 N.E.2d 362, 367: "It is essential * * * that [the contemnor] have notice * * * either actual or by service * * * upon him;" *McGill v. McGill* (1982), 3 Ohio App.3d 455, 457, 3 OBR 535, 538, 445 N.E.2d 1163, 1166: "[N]otice which is reasonably calculated to reach the individual alleged to be in contempt * * * will withstand objection. Despite the potential for imprisonment there is no requirement that such notice must be personally served upon the individual"; *Rose v. Rose* (Mar. 31, 1997), Franklin App. No. 96APF09–1150, unreported, 1997 WL 142718, citing *State v. Union, supra,* at 87, 15 O.O.2d at 140–141, 173 N.E.2d at 340, for rule that "[s]ervice upon [the contemnor] is not required when he has actual notice." See, also, *Hansen v. Hansen* (1999), 132 Ohio App.3d 795, 800, 726 N.E.2d at 560–561 (personal service may be required under the Civil Rules depending upon the circumstances). Contrary to *Hansen,* see *Courtney v. Courtney* (1984), 16 Ohio App.3d 329, 16 OBR 377, 475 N.E.2d 1284 (Civil Rules do not apply to contempt proceedings under Civ.R. 1[C][7], since they are sui generis actions, not civil actions). Contrary to *Courtney,* see *Quisenberry v. Quisenberry* (1993), 91 Ohio App.3d 341, 632 N.E.2d 916 (service of contempt citation and notice must be in accordance with Civil Rules).

 Service of notice can be waived. *In re Harper* (Oct. 17, 1989), Monroe App. No. 650, unreported, 1989 WL 122537 (notice waived by voluntary appearance); NLM Contempt, *supra,* at 227: "Parties who appear in response to contempt proceedings cannot complain of lack of process." See 60 A.L.R.2d 1244 and 76 A.L.R.Fed. 797.

### Due Process: (3) Right to Bail

 An accused contemnor has the due process right to bail. United States Constitution, Bill of Rights, Amendment VIII ("Excessive bail shall not be required"); Ohio Constitution, Bill of Rights, Section 9, Article I ("All persons shall be bailable * * * Excessive bail shall not be required."); *In re Berman* (1949), 86 Ohio App. 411, 414, 42 O.O. 13, 14–15, 87 N.E.2d 716, 718 ("To deny bail before trial, except in capital offenses, is a violation of a sacred basic human right

guaranteed by the Constitution of the United States and the Constitution of Ohio"). See R.C. 2709.04 and Ohio Crim.R. 46 ("Bail").

## Due Process: (4) Right to Counsel

An accused contemnor in criminal and civil contempt cases has the due process right to counsel, including court-appointed counsel if indigent and incarceration is a possible sanction. United States Constitution, Bill of Rights, Amendment VI ("In all criminal prosecutions, the accused shall * * * have the Assistance of Counsel for his defence."); Ohio Constitution, Bill of Rights, Section 10, Article I ("In any trial, in any court, the party accused shall be allowed to appear and defend in person and with counsel."); *In re Oliver, supra,* at 273, 68 S.Ct. at 507–508, 92 L.Ed. at 694 (right to be represented by counsel is " 'basic in our system of jurisprudence' "); *Argersinger v. Hamlin, supra* (appointment of counsel for indigent contemnor, quoting *Gideon v. Wainwright* (1963), 372 U.S. 335, 344, 83 S.Ct. 792, 797, 9 L.Ed.2d 799, 805: "The right of one charged with crime to counsel may not be deemed fundamental and essential to fair trials in some countries, but it is in ours."); *In re Neff, supra,* at 236, 49 O.O.2d at 325– 326, 254 N.E.2d at 40–41 (Ohio Constitution guarantees "right to appear with counsel of his choosing for purpose of a hearing" which may result in "deprivation of his liberty by imprisonment, although not in the penitentiary and not for more than one year"); *State v. Wellman* (1974), 37 Ohio St.2d 162, 171, 66 O.O.2d 353, 358, 309 N.E.2d 915, 920–921 (absent waiver, no person may be imprisoned for any offense unless represented by counsel). See R.C. 2705.03 and Ohio Crim.R. 44 ("Assignment of Counsel").

An accused contemnor in a civil contempt case has the right to counsel where incarceration is a possible sanction. *Lassiter v. Dept. of Social Serv.* (1981), 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640; *Schock v. Sheppard* (1982), 7 Ohio App.3d 45, 7 OBR 48, 453 N.E.2d 1292; *In re Miami County Grand Jury Dir. To Creager* (1992) 82 Ohio App.3d 269, 611 N.E.2d 881; *In re Estate of Straub* (Feb. 13, 1992), Ross App. No. 1728, unreported, 1992 WL 37781; *Young v. Whitworth* (S.D.Ohio 1981), 522 F.Supp. 759; *Mastin v. Fellerhoff* (S.D.Ohio 1981), 526 F.Supp. 969; *Sevier v. Turner* (C.A.6, 1984), 742 F.2d 262. Although the Ohio Supreme Court decision in *In re Calhoun* (1976), 47 Ohio St.2d 15, 1 O.O.3d 10, 350 N.E.2d 665, to the contrary was decided before *Lassiter,* several disputable later Ohio appellate court decisions follow *Calhoun* despite *Lassiter. Courtney v. Courtney* (1984), 16 Ohio App.3d 329, 16 OBR 377, 475 N.E.2d 1284; *Thomas v. Thomas* (Oct. 3, 1990), Summit App. No. 14581, unreported, 1990 WL 152898; *Recco v. Recco* (Apr. 20, 1992), Tuscarawas App. No. 91AP100075, unreported, 1992 WL 89967. See R.C. 2937.02, 52 A.L.R.3d 1002, and 32 A.L.R.5th 31.

■ A valid waiver of the right to counsel will not be presumed from a silent record. *Boykin v. Alabama* (1969), 395 U.S. 238, 242, 89 S.Ct. 1709, 1712, 23 L.Ed.2d 274, 279, quoting *Carnley v. Cochran*, 369 U.S. 506, 516, 82 S.Ct. 884, 890, 8 L.Ed.2d 70, 77: " 'Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not a waiver' "; *Garfield Hts. v. Brewer* (1984), 17 Ohio App.3d 216, 217, 17 OBR 458, 459, 479 N.E.2d 309, 311–312; "The requirements of the Criminal Rules {Rules 22 and 44(B)} are mandatory; all waivers of counsel must be made in open court and must be recorded"; *Garfield Hts. v. Stefaniuk* (1998), 127 Ohio App.3d 293, 296–297, 712 N.E.2d 808, 809–811 (applying *Lassiter* and *Boykin*).

### Due Process: (5) Right to Time to Prepare Defense

■ An accused contemnor has the due process right to reasonable time to prepare his defense, in light of the circumstances of the case. *In re Oliver*, *supra*, at 273, 68 S.Ct. at 507, 92 L.Ed. at 694 ("reasonable opportunity to defend himself [is] basic in our system of jurisprudence"); *Nilva v. United States* (1957), 352 U.S. 385, 395, 405–406, 77 S.Ct. 431, 437, 442–443, 1 L.Ed.2d 415, 423, 428–429 (dissent) ("circumstances of this case" determine whether "adequate time to prepare his defense"); *Ungar v. Sarafite* (1964), 376 U.S. 575, 588–591, 84 S.Ct. 841, 849–851, 11 L.Ed.2d 921, 930–931 (denial of motion to continue, under circumstances, not violation of due process); *Pease v. Union* (1978), 59 Ohio App.2d 238, 13 O.O.3d 246, 393 N.E.2d 504 (reasonable time between service of notice of show cause order and contempt trial depends upon circumstances of case and is committed to informed discretion of trial court).

■ As stated in NLM Contempt, *supra*, at 223, 225–226: "[N]otice must be given a reasonable time before the hearing * * * If the contemnor believes that notice to him of the hearing to show cause why he should not be punished for contempt is unreasonably short he should object and ask for more time at or before the date of the hearing. If he does not do this and is present in court and offers testimony he cannot complain that the time was too short." See 39 L.Ed.2d 1031, at 1040.

### Due Process: (6) Right to be Present at Trial

■ An accused contemnor has the due process right to be present at trial, and may not be tried in absentia unless he has waived his right to be present. United States Constitution, Bill of Rights, Amendment VI ("In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him"); Ohio Constitution, Bill of Rights, Section 10, Article I

("In any trial, in any court, the party accused shall be allowed to appear and defend in person."); *Argersinger v. Hamlin, supra,* at 28, 92 S.Ct. at 2008, 32 L.Ed.2d at 533–534 ("the right of confrontation"); *In re Oliver, supra,* at 273, 68 S.Ct. at 507–508, 92 L.Ed. at 694 ("right to his day in court * * * [is] basic in our system of jurisprudence"); *Cooke v. United States, supra,* at 537, 45 S.Ct. at 395, 69 L.Ed. at 774 ("accused should * * * have a reasonable opportunity to meet [contempt charges] by way of defense or explanation"). As noted in NLM Contempt, *supra,* at 77: "As in prosecutions for crime, the accused in proceedings for criminal contempt has the right to be present during the entire proceedings. He is entitled to meet the witnesses face to face." See 39 L.Ed. 1031, at 1040, and Ohio Crim.R. 43 ("Presence of the Defendant").

 The right to be present at trial can be waived. *Blackmer v. United States, supra* (waiver); *In re Terry, supra* (waiver where contemnor's absence voluntary); *Adams v. Epperly* (1985), 27 Ohio App.3d 51, 53, 27 OBR 54, 56, 499 N.E.2d 374, 376 ("It is the burden of the [state], not the accused, to affirmatively demonstrate that * * * he has knowingly, intelligently, and voluntarily waived his right to be present and participate at trial.").

The right to be present at trial gives rise to several practices considered to be desirable and which may rise to the level of due process rights: (a) prior warning, and (b) right of allocution, the formal inquiry by the court to a convicted defendant before pronouncing sentence as to whether he has anything to say why sentence should not be imposed upon him. 3A Corpus Juris Secundum (1973), at 252. The desirability of prior warning before a finding of direct contempt has been impliedly approved, but not mandated, by the United States Court in *Illinois v. Allen* (1970), 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (repeated warnings by trial judge that accused "would be removed * * * if he persisted in his unruly conduct."). See, also, *United States v. Schiffer* (C.A.6, 1965), 351 F.2d 91, 95, certiorari denied (1966), 384 U.S. 1003, 86 S.Ct. 1914, 16 L.Ed.2d 1017 (warning "generally desirable" but not essential where conduct clearly contumacious), and *United States v. Abascal* (C.A.9, 1975), 509 F.2d 752, 755, certiorari denied (1975), 422 U.S. 1027, 95 S.Ct. 2621, 45 L.Ed.2d 684 (failure to give warning that conduct may be contumacious not reversible error, but such warning may be appropriate).

The custom or right of allocution of the accused to address the court after a finding of guilt and before the imposition of sanction may apply in direct contempt. *Groppi v. Leslie* (1972), 404 U.S. 496, 92 S.Ct. 582, 30 L.Ed.2d 632 (customary to give the right of allocution). The failure of an Ohio court to advise the accused of the right of allocution constitutes reversible error. As recently declared by Chief Justice Moyer in *State v. Campbell* (2000), 90 Ohio St.3d 320, 323, 738 N.E.2d 1178, 1188: "Pursuant to Crim.R. 32(A)(1), before imposing

sentence, a trial court must address the defendant personally and ask whether he or she wishes to make a statement in his or her own behalf or present any information in mitigation of punishment."

## Due Process: (7) Right to Public Trial

■ An accused contemnor has the due process right to a public trial. United States Constitution, Bill of Rights, Amendment VI ("In all criminal prosecutions, the accused shall enjoy the right to a * * * public trial"); Ohio Constitution, Bill of Rights, Section 10, Article I ("In any trial, in any court, the party accused shall be allowed * * * to have * * * a speedy public trial"); *Argersinger v. Hamlin, supra,* at 27–28, 92 S.Ct. at 2008, 32 L.Ed.2d at 532–533: "One [due process right] is the requirement of a 'public trial' "; *Levine v. United States* (1960), 362 U.S. 610, 617–620, 80 S.Ct. 1038, 1043–1045, 4 L.Ed.2d 989, 995–998 (contemnor has right upon request in summary contempt trial to have courtroom opened so findings and sanctions can occur in public, with dissent declaring that an open court should be mandatory without request, to prevent "a government trial technique that liberty-loving people have with great reason feared and hated in all ages"). *In re Berman* (1949), 86 Ohio App. 411, 42 O.O. 13, 87 N.E.2d 716. See R.C. 2705.05.

In *In re Oliver, supra,* at 273, 266, 278, 68 S.Ct. at 507–508, 504, 510, 92 L.Ed. at 694, 690–691, 696–697, the United States Supreme Court discusses "this nation's historic distrust of secret proceedings, their inherent dangers to freedom, and the universal requirement of our federal and state governments that criminal trials be public"; this case points out that "we have been unable to find a single instance of a criminal trial conducted in camera in any federal, state, or municipal court during the history of this country. Nor have we found any record of even one such secret criminal trial in England since abolition of the Court of Star Chamber in 1641, and whether that court ever convicted people secretly is in dispute"; and concludes that "[i]t is 'the law of the land' that no man's life, liberty or property be forfeited as a punishment until there has been a charge fairly made and fairly tried in a public tribunal." See 39 L.Ed.2d 1031, at 1043.

## Due Process: (8) Right to Speedy Trial

■ An accused contemnor has the constitutional right to a speedy trial. United States Constitution, Bill of Rights, Amendment VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy * * * trial."); Ohio Constitution, Bill of Rights, Section 10, Article I ("In any trial, in any court, the party accused shall be allowed * * * to have * * * a speedy public trial."); *Klopfer v. North Carolina* (1967), 386 U.S. 213, 223, 87 S.Ct. 988, 993–994, 18 L.Ed.2d 1, 18 L.Ed.2d 1, 8 (the right to a speedy trial is "fundamental" and applies to states through Fourteenth Amendment); *Barker v. Wingo* (1972), 407

U.S. 514, 515, 92 S.Ct. 2182, 2184–2185, 33 L.Ed.2d 101, 108–109 (establishing "four factor balancing test" and characterizing speedy trial right as unique in its uncertainty and a right which "necessarily compels courts to approach speedy trial cases on an *ad hoc* basis"); *State v. Butler* (1969), 19 Ohio St.2d 55, 56–57, 48 O.O.2d 77, 77–78, 249 N.E.2d 818, 819–820 (right to speedy trial not self-executing, and demand by accused is necessary to invoke constitutional protection); *State v. Meeker* (1971), 26 Ohio St.2d 9, 16–17, 55 O.O.2d 5, 9–10, 268 N.E.2d 589, 594–595 (speedy trial guarantee applies to unjustified delay in commencing prosecution as well as to unjustified delay after indictment). See *State v. Bound* (1975), 43 Ohio App.2d 44, 72 O.O.2d 197, 332 N.E.2d 366; *State v. Davis* (1975), 44 Ohio App.2d 95, 73 O.O.2d 89, 335 N.E.2d 874; *State v. Gettys* (1976), 49 Ohio App.2d 241, 3 O.O.3d 286, 360 N.E.2d 735; *State v. Stephens* (1977), 52 Ohio App.2d 361, 6 O.O.3d 404, 370 N.E.2d 759; *State v. Reed* (1977), 54 Ohio App.2d 193, 8 O.O.3d 333, 376 N.E.2d 609; *State v. Workman* (1977), 60 Ohio App.2d 204, 14 O.O.3d 181, 396 N.E.2d 777.

■ An accused contemnor does not have the statutory right to a speedy trial. *State v. Khong* (Cuyahoga App.1985), 29 Ohio App.3d 19, 29 OBR 20, 502 N.E.2d 682 (speedy trial statute [R.C. 2945.71] inapplicable because by definition it applies only to misdemeanors and felonies, and contempt is neither). See 40 Ohio St.L.J. 363 (1979).

## Due Process: (9) Right to Jury Trial

■ An accused contemnor has the qualified right to a jury trial in a criminal contempt case. United States Constitution, Section 2, Article III ("The trial of all crimes * * * shall be by jury"); United States Constitution, Bill of Rights, Amendment VI ("In all criminal prosecutions, the accused shall enjoy the right to * * * an impartial jury."); United States Constitution, Bill of Rights, Amendment VII ("In suits at common law * * * the right of trial by jury shall be preserved."); Ohio Constitution, Bill of Rights, Section 5, Article I ("The right of trial by jury shall be inviolate."); *Cheff v. Schnackenberg* (1966), 384 U.S. 373, 86 S.Ct. 1523, 16 L.Ed.2d 629 (right to jury trial in federal criminal contempt case attaches if punishment more than "petty sanction"); *Shillitani v. United States* (1966), 384 U.S. 364, 365, 86 S.Ct. 1531, 1533, 16 L.Ed.2d 622, 624 (no right to jury trial in civil contempt case); *Duncan v. Louisiana* (1968), 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (right to jury trial for "serious offenses" applied to states under Sixth Amendment); *Bloom v. Illinois* (1968), 391 U.S. 194, 88 S.Ct. 1477 20 L.Ed.2d 522 (no significant prison sentence can be imposed without affording accused contemnor a jury trial); *Baldwin v. New York* (1970), 399 U.S. 66, 69, 90 S.Ct. 1886, 1888, 26 L.Ed.2d 437, 440–441 (right to jury trial where offense carries maximum incarceration greater than six months); *Codispoti v.*

*Pennsylvania* (1974), 418 U.S. 506, 94 S.Ct. 2687, 41 L.Ed.2d 912 (requiring jury trial where aggregate total of sentences on direct contempts exceeds six months); *Blanton v. N. Las Vegas* (1989), 489 U.S. 538, 109 S.Ct. 1289, 103 L.Ed.2d 550 (maximum six-month incarceration plus license suspension does not take case out of "petty offense" category); *United States v. Nachtigal* (1993), 507 U.S. 1, 113 S.Ct. 1072, 122 L.Ed.2d 374 (multiple petty offenses each with maximum six month incarceration to be tried together does not take case out of "petty" category and give rise to right to jury trial); *State v. Weiner* (1974), 37 Ohio St.2d 11, 13, 66 O.O.2d 6, 7, 305 N.E.2d 794, 796 (no right to jury trial for petty offense, following *Cheff*); contrary to *Cheff* and *Weiner*, see *Reed v. State* (Fla.1985), 470 So.2d 1382, 1384: "[A] maximum penalty of less than six months does not necessarily place a crime in the petty crime category" which may be tried without a jury. See 26 L.Ed.2d 916, 45 L.Ed.2d 815, 103 L.Ed.2d 1000, and 33 A.L.R.Fed. 849.

Ohio Crim.R. 2(C) provides: " 'Serious offense' means any felony, and any misdemeanor for which the penalty prescribed by law includes confinement for more than six months.' " Ohio Crim.R. 2(D) provides: " 'Petty offense' means a misdemeanor other than serious offense."

▮ There is no statutory right to a jury trial in a contempt case in Ohio. Although R.C. 2945.17 provides the right to a jury trial for every "offense" where the possible penalty exceeds $100, contempt is not an "offense" under R.C. 2901.02(A). See Ohio Crim.R. 23 ("Trial by Jury or by the Court").

## Due Process: (10) Right to Impartial Judge

The right of an accused to be tried by a fair and impartial judge is a basic right of due process. *Tumey v. Ohio* (1927), 273 U.S. 510, 532, 47 S.Ct. 437, 444, 71 L.Ed. 749, 758; *In re Murchison* (1955), 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942, 946; *Ward v. Village of Monroeville* (1972), 409 U.S. 57, 62, 93 S.Ct. 80, 84, 34 L.Ed.2d 267, 272. "As in the exercise of all power, [the contempt power] was abused. Some English judges extended their authority for checking interferences with judicial business actually in hand, to 'lay by the heel' those responsible for 'scandalizing the court,' that is, bringing it into general disrepute. Such foolishness has long since been disavowed in England and has never found lodgment here." *Bridges v. California* (1941), 314 U.S. 252, 287, 62 S.Ct. 190, 205, 86 L.Ed. 192, 216. "The personal feelings of the Judges have never had the slightest influence in the exercise of those [contempt] powers entrusted to them for the purpose of supporting the dignity of their important office * * * they have been uniformly exercised for the good of the people." Oswald, Contempt of Court, *supra*, at 9. "We know in our hearts that an insult is harder to forgive than an injury." 28 Colum.L.Rev. 401, *supra*, at 402.

■ An accused contemnor has the due process right to an impartial judge who has not become "personally embroiled" in the case, although the judge hearing the main case usually is not disqualified from hearing the contempt case. In *Cooke v. United States, supra,* at 539, 45 S.Ct. at 395–396, 69 L.Ed. 767, 775, the United States Supreme Court expounded at length on judicial impartiality, taking a middle-of-the-road approach: "The power of contempt which a judge must have and exercise in protecting the due and orderly administration of justice and in maintaining the order and dignity of the court is most important and indispensable. But its exercise is a delicate one and care is needed to avoid arbitrary or oppressive conclusions. This rule of caution is more mandatory where the contempt charged has in it the element of personal criticism or attack upon the judge. The judge must banish the slightest personal impulse to reprisal, but he should not bend backward and injure the authority of the court by too great leniency. The substitution of another judge would avoid either tendency but it is not always possible. Of course where acts of contempt are palpably aggravated by a personal attack upon the judge in order to drive the judge out of the case for ulterior reasons, the scheme should not be permitted to succeed * * *. All we can say upon the whole matter is that where conditions do not make it impracticable, or where the delay may not injure public or private right, a judge called upon to act in a case of contempt by personal attack upon him, may, without flinching from his duty, properly ask that one of his fellow judges take his place." A more conciliatory but less definitive approach is suggested by Oswald: "It would seem, therefore, more advisable in all instances (except those of the most gross misconduct), that in order to avoid any possible suspicion of being actuated by overheated or intemperate motives, the Court should, instead of dealing summarily with the offence, give the offending party an opportunity of explaining or purging his contempt." Oswald, Contempt of Court, *supra,* at 39.

Numerous cases involve judicial impartiality. "The delicacy there is in the judge's deciding whether an attack upon his own judicial action is mere criticism [of the judge] or real obstruction [of the administration of justice], and the possibility that impulse may incline his view to personal vindication, are manifest." *Craig v. Hecht* (1923), 263 U.S. 255, 279, 44 S.Ct. 103, 68 L.Ed. 293 (Taft, C.J., concurring). *Myers v. State* (1889), 46 Ohio St. 473, 22 N.E. 43 (necessities of case require that the affronted judge preside); *Offutt v. United States* (1954), 348 U.S. 11, 14–18, 75 S.Ct. 11, 13–16, 99 L.Ed. 11, 16–18 (judge became "personally embroiled" with counsel); *Ungar v. Sarafite* (1964) 376 U.S. 575, 84 S.Ct. 841, 11 L.Ed.2d 921 (trial judge became "personally embroiled" with witness); *Taylor v. Hayes* (1974), 418 U.S. 488, 501, 94 S.Ct. 2697, 2704–2705, 41 L.Ed.2d 897, 909 (test "not only whether there was actual bias * * * but also whether there was 'such a likelihood of bias or an appearance of bias that the

judge was unable to hold the balance between vindicating the interests of the court and the interest of the accused.' "); *Mayberry v. Pennsylvania* (1971), 400 U.S. 455, 462–465, 91 S.Ct. 499, 503–505, 27 L.Ed.2d 532, 538–540 (although accused contemnor entitled to separate proceeding if judge has become personally embroiled, "[i]t is, of course, not every attack on a judge that disqualifies him from sitting"); *State v. Conliff* (1978), 61 Ohio App.2d 185, 15 O.O.3d 309, 401 N.E.2d 469 (contemnor asked judge if he was ready to extract his "ounce of flesh"); *State v. Weiner* (1974), 37 Ohio St.2d 11, 66 O.O.2d 6, 305 N.E.2d 794 (where the alleged contempt is a personal insult or vilification of the judge, he should recuse himself *sua sponte* and another judge appointed to conduct the contempt hearing). See 64 A.L.R.2d 600, 21 A.L.R.3d 1369, 40 A.L.R.3d 1204, 60 A.L.R.3d 176, 70 A.L.R.3d 797, 25 A.L.R.4th 923, 37 A.L.R.4th 1004, 54 A.L.R.5th 575, 39 L.Ed.2d 1031, 89 L.Ed.2d 1066, 3 A.L.R.Fed. 420, 22 A.L.R.Fed. 709, and R.C. 2701.03.

 Although a litigant has the due process right for good cause to petition for disqualification of the judge presiding in his case, there are limitations upon the right. If the affidavit of prejudice or request for disciplinary action is not made in good faith, fails to specify material facts supporting the alleged grounds of disqualification, or is made untimely, its filing may constitute the offense of contempt, and also a violation of criminal statute prohibiting attempts to intimidate or influence a public official. *Cooke v. United States, supra,* at 534, 45 S.Ct. at 394, 69 L.Ed. at 772–773. See Annotation, "Affidavit or Motion for Disqualification of Judge as Contempt," 70 A.L.R.3d 797, and "Contempt Finding as Precluding Substantive Criminal Charges Relating to Same Transaction," 26 A.L.R.4th 950. See R.C. 2921.03 (Intimidation of a Public Official), and *United States v. Dixon* (1993), 509 U.S. 688, 113 S.Ct. 2849, 125 L.Ed.2d 556.

### Due Process: (11) Right to Subpoena and Call Witnesses

 An accused contemnor has the due process right to subpoena and call witnesses on his behalf. United States Constitution, Bill of Rights, Amendment VI ("In all criminal prosecutions, the accused shall enjoy the right * * * to have compulsory process for obtaining witnesses in his favor."); Ohio Constitution, Bill of Rights, Section 10, Article I ("In any trial, in any court, the party accused shall be allowed * * * to have compulsory process to procure the attendance of witnesses in his behalf."); *Cooke v. United States, supra,* at 537, 45 S.Ct. at 395, 69 L.Ed. at 774 (reasonable opportunity to defend against contempt charges includes "the right to call witnesses to give testimony"); *In re Oliver, supra,* at 273, 68 S.Ct. at 507–508, 92 L.Ed. at 694 ("right to his day in court [is] basic in our system of jurisprudence, and * * * include[s] * * * a right * * * to offer testimony"); *Argersinger v. Hamlin, supra,* at 28, 92 S.Ct. at 2008, 32 L.Ed.2d at

533–534 ("Another [guarantee] is compulsory process for obtaining witnesses in one's favor"); *In re Neff, supra*, at paragraph twelve of the syllabus ("right to present witnesses").

### Due Process: (12) Right to Cross Examine Adverse Witnesses

An accused contemnor has the due process right to cross-examine adverse witnesses. United States Constitution, Bill of Rights, Amendment VI ("In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him."); Ohio Constitution, Bill of Rights, Section 10, Article I ("In any trial, in any court, the party accused shall be allowed to * * * meet the witnesses face to face."); *In re Oliver, supra*, at 273, 68 S.Ct. at 507–508, 92 L.Ed. at 694 ("right to his day in court [is] basic in our system of jurisprudence, and * * * include[s] * * * a right to examine the witnesses against him"); *Pointer v. Texas* (1965), 380 U.S. 400, 405, 85 S.Ct. 1065, 1068–1069, 13 L.Ed.2d 923, 927 ("unanimous" belief by courts that "right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal"); *Argersinger v. Hamlin, supra*, at 28, 92 S.Ct. at 2008, 32 L.Ed.2d at 533–534 ("Still another [guarantee is] the right of confrontation"); *In re Neff, supra*, at 239, 49 O.O.2d at 327–328, 254 N.E.2d at 42 ("Due process gives a defendant a constitutional right to cross-examine witnesses appearing against him, and the right extends to state trials whether for felony or misdemeanors, including contempt proceedings * * * [D]enial of defendant's right of cross-examination, without waiver, would be constitutional error, and no amount of showing of want of prejudice would cure it.").

### Due Process: (13) Right to Presumption of Innocence

An accused contemnor has the due process right to the presumption of innocence. *Gompers v. Buck's Stove, supra*, at 444, 31 S.Ct. at 499, 55 L.Ed. at 807 ("[I]t is certain that in proceedings for criminal contempt the defendant is presumed to be innocent"); *Michaelson v. United States, supra*, at 66, 45 S.Ct. at 20, 69 L.Ed. at 167–168 ("in criminal contempt, as in criminal cases, the presumption of innocence obtains"); *Loney v. Hall* (Knox App.1917), 8 Ohio App. 154, at paragraph two of the headnote: "A proceeding for contempt [includes] the presumption in favor of the innocence of the defendant"; *State v. Treon, supra*, at paragraph three of the headnote ("One charged with criminal contempt is entitled to the constitutional guarantees provided for those charged with crime including the presumption of innocence."); *State v. Sherow* (1956), 101 Ohio App. 169, 171, 1 O.O.2d 100, 100–101, 138 N.E.2d 444, 445–446 ("In a contempt proceeding * * * there is a presumption of innocence in favor of the accused.") As simply stated in NLM Contempt, *supra*, at 76: "[T]he presumption of innocence obtains."

### Due Process: (14) Right to Invoke Privilege Against Self–Incrimination

██ An accused contemnor has the due process right to invoke the privilege against self-incrimination. United States Constitution, Bill of Rights, Amendment V ("No person shall * * * be compelled in any criminal case to be a witness against himself."); Ohio Constitution, Bill of Rights, Section 10, Article I ("No person shall be compelled, in any criminal case, to be a witness against himself."); *Gompers v. Buck's Stove, supra,* at 444, 31 S.Ct. at 499, 55 L.Ed. at 807: "[I]t is certain that in proceedings for criminal contempt the defendant * * * cannot be compelled to testify against himself;" *Michaelson v. United States, supra,* at 66, 45 S.Ct. at 20, 69 L.Ed. at 167–168 ("defendant may not be compelled to be a witness against himself"); *In re Neff, supra,* at 239, 49 O.O.2d at 327–328, 254 N.E.2d at 42 ("Both Fifth Amendment of the Constitution of the United States and Section 10, Article I of the Constitution of Ohio provide that no person shall be compelled, in any criminal case, to be a witness against himself"); *In re Treon,* at paragraph three of the syllabus. "[T]he accused can not be called for cross examination without his consent." *State v. Sherow* (1956), 101 Ohio App. 169, 171, 1 O.O.2d 100, 100–101, 138 N.E.2d 444, 445–446. There must be a prima facie case before the court can give the accused contemnor an opportunity to explain self and cannot force him to say anything. *Springfield v. Myers* (1988), 43 Ohio App.3d 21, 24–25, 538 N.E.2d 1091, 1094–1096.

██ In cases of civil contempt, however, the accused contemnor may be called as a witness. *Symons v. Rice* (1917), 11 Ohio App. 348, 1917 WL 1100 (not error to compel accused contemnor to testify in civil contempt case); *Bloomberg v. Roach* (1930), 43 Ohio App. 178, 189, 182 N.E. 891, 895 (contemnor is merely "thereby aided in being afforded an early opportunity to make explanation, and to show cause why he was not in contempt of court"); *Jacobs v. Cook* (1953), 95 Ohio App. 480, 486, 54 O.O. 108, 111, 121 N.E.2d 184, 187 ("not error to call a defendant as on cross examination" in civil contempt case). As declared in NLM Contempt, *supra,* at 91: "In civil contempt, the petitioner may call the defendant as a witness."

### Due Process: (15) Right to Proper Burden of Proof

██ An accused contemnor has the due process right to the proper burden of proof, which is beyond a reasonable doubt in criminal contempt cases. *Gompers v. Buck's Stove, supra,* at 444, 31 S.Ct. at 499, 55 L.Ed. at 807 ("it is certain that in proceedings for criminal contempt the defendant * * * must be proved to be guilty beyond a reasonable doubt"); *Michaelson v. United States, supra,* at 66, 45 S.Ct. at 20, 69 L.Ed. at 167–168 ("[p]roof of guilt must be beyond reasonable doubt"); *Hicks v. Feiock, supra,* at 632, 108 S.Ct. at 1429–1430, 99 L.Ed.2d at 731–732 (proof beyond a reasonable doubt); *Brown v. Executive, supra,* at 252,

18 O.O.3d at 447–448, 416 N.E.2d at 612 ("[W]e now hold that the standard of proof required in criminal contempt proceedings is proof of guilt beyond a reasonable doubt.)."

Almost all courts require clear and convincing evidence in civil contempt cases. Dudley, Getting Beyond the Civil/Criminal Distinction: A New Approach to the Regulation of Indirect Contempts (1993), 79 Va.L.Rev. 1025, 1032, fn. 23; *Brown v. Executive, supra,* at 254, 18 O.O.3d at 449, 416 N.E.2d at 613 (clear and convincing standard by implication); *Pugh v. Pugh* (1984), 15 Ohio St.3d 136, 139, 15 OBR 285, 287, 472 N.E.2d 1085, 1087 (citing *Brown* for clear and convincing standard); *Contex, Inc. v. Consolidated Technologies, Inc.* (1988), 40 Ohio App.3d 94, 531 N.E.2d 1353 ("A finding of civil contempt may be made upon clear and convincing evidence," citing *Brown*); *Internatl. v. Mearns* (1989) 63 Ohio App.3d 32, 37, 577 N.E.2d 1128, 1131 ("clear and convincing evidence," citing *Brown*); *Rinehart v. Rinehart* (1993), 87 Ohio App.3d 325, 328, 622 N.E.2d 359, 360–361 ("In a civil contempt proceeding * * * the movant must prove, by clear and convincing evidence, that the defendant violated the court order," citing *Pugh*); *Carroll v. Detty* (1996), 113 Ohio App.3d 708, 711, 681 N.E.2d 1383, 1384–1385 ("The burden of proof in a civil contempt action is clear and convincing evidence," citing *Brown*); *Newbury Twp. v. Pracker* (Sept. 12, 1986) Geauga App. No. 1249, unreported, 1986 WL 10022 ("clear and convincing evidence," citing *Brown*); *Sancho v. Sancho* (1996), 114 Ohio App.3d 636, 642, 683 N.E.2d 849, 853 ("To make a finding of civil contempt of court, the evidence must be clear and convincing," citing *Contrex*); *Whitehall v. Bambi Motel, Inc.* (Dec. 18, 1997), Franklin App. No. 97APC04–539, unreported, 1997 WL 781900 ("The burden of proof in a civil contempt case is clear and convincing evidence," citing *Brown*); *Rudduck v. Rudduck* (June 16, 1999), Licking App. No. 98CA85, unreported, 1999 WL 436818 (citing *Brown*); *In re Cox* (Dec. 23, 1999), Geauga App. Nos. 98–G–2183 and 98–G–2184, unreported, 1999 WL 1312688 ("In cases of civil contempt, a majority of appellate courts in Ohio, including this court, have held that the burden of proof is clear and convincing evidence.").

English law applies the beyond a reasonable doubt standard to civil contempt proceedings. *Re Bramblevale Ltd.* (1970), Ch. 128, 3 All E.R. 1062; *Dean v. Dean* (1987), 1 FLR 517, cited in Miller, Contempt of Court, *supra,* at 28.

### Due Process: (16) Right to Appeal

■■■ The right to appellate review is one of the most important, if not the most important, due process rights of a contemnor. The right to appeal did not exist at common law, with Blackstone stating: "The sole adjudication of contempts, and the punishment therefore * * * belongs exclusively, and without interfering, to each respective Court." *Ex parte Kearney* (1822), 20 U.S. (7

Wheat.) 38, 5 L.Ed. 391 (no right of review of lower federal court's contempt judgment because contempt judgments unreviewable at common law, relying upon *Case of Brass Crosby* (K.B.1771), 95 Eng.Rep. 1005, 1014). It wasn't until a century ago, in *Bessette v. W.B. Conkey* (1904), 194 U.S. 324, 24 S.Ct. 665, 48 L.Ed. 997, that the United States Supreme Court asserted jurisdiction over criminal contempt convictions. England did not provide for appellate review in contempt cases until 1960. Administration of Justice Act 1960, Section 13. Appellate review is considered by legal commentators to be a significant due process safeguard against possible abuse of the summary contempt power. Kuhns, *supra*, 88 Yale L.J. 39, 69. The United States Supreme Court has declared that appellate courts have a "special responsibility" to review contempt convictions. *Green v. United States* (1958), 356 U.S. 165, 188, 78 S.Ct. 632, 645, 2 L.Ed.2d 672, 690–691.

 A criminal contempt conviction is a separate final judgment from which an immediate appeal may be taken regardless of the status of the underlying case. *In re Christensen Eng. Co.* (1904), 194 U.S. 458, 24 S.Ct. 729, 48 L.Ed. 1072. A civil contempt finding against a party is not a final order and is reviewable only upon appeal of the underlying case. *Doyle v. London Guarantee* (1907), 204 U.S. 599, 608, 27 S.Ct. 313, 316, 51 L.Ed. 641, 645; *Fox v. Capital* Co. (1936) 299 U.S. 105, 107, 57 S.Ct. 57, 58–59, 81 L.Ed. 67, 68–69. As to nonparties, however, a finding of civil contempt is immediately appealable as a final judgment, upon the basis that it involves separate proceedings in which the contempt sanction represents the final judgment. *Alexander v. United States* (1906), 201 U.S. 117, 121, 26 S.Ct. 356, 357–358, 50 L.Ed. 686, 688; *Cobbledick v. United States* (1940) 309 U.S. 323, 328, 60 S.Ct. 540, 542–543, 84 L.Ed. 783, 786–787; *United States v. Ryan* (1971) 402 U.S. 530, 533, 91 S.Ct. 1580, 1582, 29 L.Ed.2d 85, 88–89; *United States Catholic Conference v. Abortion Rights Mobilization* (1988) 487 U.S. 72, 76, 108 S.Ct. 2268, 2270–2271, 101 L.Ed.2d 69, 76–77.

The Supreme Court of Ohio has held that the sole standard of review in a civil appeal is abuse of discretion, which does not include a weight-of-the-evidence standard. *State v. Birkel* (1981), 65 Ohio St.2d 10, 11, 19 O.O.3d 191, 191–192, 417 N.E.2d 1249, 1249–1250; *State v. Gibbs* (1991), 60 Ohio St.3d 69, 74, 573 N.E.2d 62, 67–68; *Rootstown Twp. v. Drennen* (Sept. 29, 2000), Portage App. No. 99–P–0096, unreported, 2000 WL 1473914; contra *Wellman Eng. v. Calderon* Automation (1965), 2 Ohio App.2d 385, 31 O.O.2d 591, 209 N.E.2d 172 (civil appeal not limited to issue of abuse of discretion; appeal as in any other civil case). See 24 A.L.R.3d 650 and 33 A.L.R.3d 448.

 To constitute a final appealable order, there must be both a finding of contempt and imposition of a sanction. *Chain Bike Corp. v. Spoke 'N Wheel* (1979), 64 Ohio App.2d 62, 64, 18 O.O.3d 43, 43–44, 410 N.E.2d 802, 803–804

("Until both a finding of contempt is made and a penalty imposed by the court, there is not a final order"); *Cooper v. Cooper* (1984), 14 Ohio App.3d 327, 14 OBR 394, 471 N.E.2d 525, paragraph one of the syllabus: ("In order for there to be final order in contempt of court proceeding, there must be both a finding of contempt and the imposition of a sanction or penalty. The mere adjudication of contempt of court is not a final appealable order until a sanction or penalty is also imposed."); *State ex rel. Doe v. Tracy* (1988), 51 Ohio App.3d 198, 199–200, 555 N.E.2d 674, 676–678 (citing *Cooper* and *Chain Bike Corp.*).

■■■■■■ In a decision which impacts upon the right of appeal, the Ohio Supreme Court has held that a contemnor does not have the right to findings of fact and conclusions of law in an indirect contempt case. *State v. Birkel* (1981), 65 Ohio St.2d 10, 12, 19 O.O.3d 191, 192, 417 N.E.2d 1249, 1250 ("Civ.R. 52 findings of fact and conclusions of law are unnecessary in a contempt proceeding"). In direct contempt cases, however, the "the trial court's judgment or order of direct contempt must itself contain a complete and clear statement of the facts upon which the conviction is based." *State v. Treon, supra,* at 242, 188 N.E.2d at 316, and contrary to the standard "abuse-of-discretion" standard of review, the guilt of a contemnor must be shown affirmatively in the record before a reviewing court may affirm, *White v. Kiraly* (Cuyahoga App.1975), Ohio App. LEXIS 6206; *State v. Hershberger* (1959), 83 Ohio Law Abs. 62, 63, 168 N.E.2d 13, 14 ("It has long been the rule that the guilt of a person convicted of contempt of court must affirmatively appear in the record"); *Ex parte Woodworth* (1893), 6 Ohio Dec N.P. 19, 21–22, 1893 WL 401; *Massillon v. Litty* (Nov. 17, 1982), Stark App. No. 5961, unreported, 1982 WL 5550 (judgment "must, at minimum, recite all the essential facts respecting which he asserts personal knowledge in his judgment entry").[3] An order committing a witness to jail as punishment for direct contempt in giving false testimony must set forth the facts fully and clearly to show that the crime was actually committed. *Tracy v. State* (Lucas App.1906), 28 Ohio C.C. 453, 8 Ohio C.C. N.S. 357, paragraph five of the syllabus. See 154 A.L.R. 1227.

As to whether a contemnor by fully performing the sanction makes an appeal moot, the modern trend is away from strict rules precluding appellate review of *criminal* cases. 9 A.L.R.3d 462, 466, fn. 3. The Supreme Court of the United States has declared that "a criminal case is moot only if it is shown that there is no possibility that any collateral legal consequences will be imposed on the basis of the challenged conviction." *Sibron v. New York* (1968), 392 U.S. 40, 57, 88 S.Ct. 1889, 1899–1900, 20 L.Ed.2d 917, 931–932 (contempt case), following *St. Pierre v. United States* (1943), 319 U.S. 41, 63 S.Ct. 910, 87 L.Ed. 1199 (contempt

---

3. See fn. 2.

case). See, also, *Carafas v. LaVallee* (1968), 391 U.S. 234, 237, 88 S.Ct. 1556, 1559, 20 L.Ed.2d 554, 558 (non-contempt case). Several non-contempt cases regarding mootness may be relevant. In *State v. Wilson* (1975), 41 Ohio St.2d 236, 237, 70 O.O.2d 431, 432, 325 N.E.2d 236, 237 (paid fine), and *State v. Berndt* (1987), 29 Ohio St.3d 3, 29 OBR 173, 504 N.E.2d 712 ("criminal offense"), the Ohio Supreme Court held that the burden is on a criminal appellant to demonstrate that he will suffer some collateral disability or loss of civil rights from such judgment or conviction, if his appeal is not to be rendered moot. The Ohio Supreme Court in *State v. Golston* (1994), 71 Ohio St.3d 224, 227, 643 N.E.2d 109, 111–112 stated: "We hold that the test for mootness outlined in *Wilson* [41 Ohio St.2d 236, 70 O.O.2d 431, 325 N.E.2d 236], and *Berndt* applies only to appeals from misdemeanor convictions." *Wilson, Berndt,* and *Golston* all involve "crimes," and are not contempt cases. Regarding mootness, also see *Addyston v. Liddle* (1935), 54 Ohio App. 323, 326, 8 O.O. 22, 24, 6 N.E.2d 877, 878 (non-contempt case holding payment of fine without protest precludes appellate review); *Avon v. Popa* (1953), 96 Ohio App. 147, 54 O.O. 226, 121 N.E.2d 254, paragraphs one and three of the syllabus (contempt case): "Such payment of the penalty does not, as a matter of law, constitute an abandonment of the appeal, nor does a defendant, as a matter of law, waive his right to secure a review of the conviction * * *. Where a fine is paid during appeal, an inference may be drawn that the defendant paid to preserve his liberty, and not because he admits the justice of the conviction or acquiesces in it, or abandons his right for review"; *State v. Green* (Apr. 6, 1990), Lawrence App. No. 1892, unreported, 1990 WL 42306 (non-contempt case) (holds that *Wilson* overruled *Popa* "to the extent they conflict"); *In re Knight* (Mar. 16, 1994), Ross App. No. 93CA1965, unreported, 1994 WL 84054 (contempt case relying upon several non-contempt cases for the proposition that "[t]he duty of this court * * * is to decide actual controversies * * * and not to give opinions upon moot questions or abstract propositions.)"; *Caron v. Manfresca* (Sept. 23, 1999), Franklin App. No. 98AP–1399, unreported, 1999 WL 739570 (purging precludes appeal). See 74 A.L.R. 638 and 9 A.L.R.3d 462.

Regarding all of the above-discussed constitutional due process guarantees, it is said in *State v. Kilbane, supra,* at 205, 15 O.O.3d 221, 223–224, 400 N.E.2d at 390: "[M]any of the significant constitutional safeguards required in criminal trials are also required in criminal contempt proceedings." See 39 L.Ed.2d 1031, and Kuhns, The Summary Contempt Power: A Critique and a New Perspective (1978), 88 Yale L.J. 39, 41, fn. 6. In England, characterization of civil contempt as quasi-criminal has lead to the gradual assimilation of the two branches of contempt, marked by application of criminal standards and safeguards to civil contempt proceedings, and essentially the abolition of the distinction. Miller, Contempt of Court, *supra,* at 27–29, 42–44.

## Findings and Decision

As noted, an order to show cause regarding indirect civil and criminal contempt for non-payment of child support is before the court in these intertwined domestic relations and parentage cases of Caron.

██ On the day of the contempt hearing, the father and mother proposed a "settlement resolution" to the court, which they claim would end their eight-year-old custody and child support litigation. On the day before the contempt hearing, about three weeks after service of the show-cause order on the father, he fortuitously paid his delinquent child support in the sum of $19,725 to the local child support agency. The parties' proposal, as initiated by the father and agreed to by the mother, provides for distribution of about twenty-five percent of this sum to the mother for the benefit of the child, with the balance of seventy-five percent returned to the father. The proposal further waives court-ordered payment by the father of over $2,300 in health-care expenses incurred by the mother on behalf of the child, and also extinguishes this court's four-year-old order designed to protect $12,000 of the child's assets in the possession of the father. In return for the mother's agreement to waive these benefits on behalf of the child, the father agrees to terminate his multitude of lawsuits in both state and federal courts that he initiated over the life of this case against numerous persons, some only remotely involved in the tragic affairs of this family.

The essential issue before the court is whether the best interests of the child are served by allowing his father who is five-and-one-half years delinquent in payment of his child support obligation to litigate the mother into submission so that she waives a major portion of the entitlements which the court has ordered the father to pay for the benefit of the child. The court finds that it is not. The settlement proposal is rejected. As declared in *Crago v. Kinzie* (2000), 106 Ohio Misc.2d 51, 59, 733 N.E.2d 1219, 1225–1226: "For at least a century and a half, the 'best interests of the child' standard has been the polestar for Ohio courts in determining matters involving children." (Emphasis added.) *Gishwiler v. Dodez* (1855), 4 Ohio St. 615, 1855 WL 28, at paragraph two of the syllabus ("In such a controversy for the custody of a child incapable of electing for itself, the order of the court should be made with a single reference to its best interests."). And as pointed out by the Supreme Court of Ohio in *Cramer v. Petrie, supra,* at 134, 637 N.E.2d at 885: *"Ohio has a direct financial interest in the enforcement of child support orders." Even more important than Ohio's direct financial interest, is its public policy interest in ensuring that the children of Ohio, its most precious assets, are not raised in poverty during their formative years.*

██ The best interests of the child demand that the father pay to the mother, for the benefit of the child, all monies and expenses previously ordered by this

court. The mother's reluctant agreement at this time is understandable, since she has been beleaguered by eight years of continuous litigation. Still, the adversity caused her by the father's litigious nature does not outweigh the absolute necessity that the child receives from the father all entitlements awarded by this court. Any precedent to the contrary would fatally undermine our child support system designed to protect children who are too vulnerable to protect themselves from their irresponsible parents who shamelessly refuse to meet their parental responsibilities voluntarily.

*Children comprise the largest abused and neglected segment of American society.*[4] Many of these innocent children suffer immensely at the hands of their irresponsible fathers who refuse to provide the necessities of life to their children, fathers who expect the public to support their children. The best interests of our children and system of justice unquestionably mandate that fathers who refuse to pay child support for years, in violation of court order, in fact go to jail as provided by law, not only for the purpose of vindicating the dignity of our judicial system, but also to send an unequivocal message to all parents who blatantly refuse to abide by court orders to support their children, that our courts will not tolerate such unconscionable arrogance which constitutes an affront to society and an insult to the dignity of their children.

■■■ The court finds that Caron was accorded all due process guarantees provided by law for indirect contempt proceedings, both civil and criminal. He received notice of civil and criminal contempt charges specifying the underlying factual basis, child non-support, more than a month before the contempt hearing. Because he was not incarcerated, the right to bail was inapplicable. Caron retained counsel for the contempt charge, and enjoyed a month to prepare his defense. He did not request a jury trial and was present with counsel of his choice at the contempt trial. Caron was presumed to be innocent and was judged by a fair and impartial judge. He exercised his rights to call witnesses on his

---

4. Almost twice as many children (20.5%) live in poverty in the United States today as do adults (11.3%), and among young families (headed by a parent under age 30) the child poverty rate between 1973 and 1994 more than doubled from 20 percent to 41 percent. That is a terrible record for the children of America, the wealthiest country in the world. *The State of America's Children: A Report from the Children's Defense Fund* (1998) (Beacon Press), at 3, 13. By 1998, 13.5 million American children—nearly one out of every five—lived in poverty. Among elderly Americans, by contrast, the poverty rate (10.5 percent) has never been lower. While there has been progress in collecting child support from absent parents (increasing from 18.3 percent in 1994), there were 19.6 million governmental child support cases in 1998, and only 23.1 percent had accomplished collection. *The State of America's Children: A Report from the Children's Defense Fund* (2000), (Beacon Press), at 4–5, 12. Ohio is a leader in child support collections, ranking 9th among the 50 states, despite recent child support distribution problems. United States Department of Health and Human Services, Office of Child Support Enforcement, 22nd Annual Report to Congress.

behalf, and to cross-examine adverse witnesses. Caron waived his right to invoke the privilege against self-incrimination by testifying on his own behalf. The court applied the clear-and-convincing standard of proof on the civil charge, and the beyond-a-reasonable-doubt standard on the criminal charge. Caron chose not to appeal, despite appealing without exception all other rulings adverse to him over a period of almost a decade.

Caron did not complain to this court or any appellate court about any alleged denial of his due process rights on the contempt charge. His only actions, before the contempt trial, were to file (a) an affidavit of prejudice requesting disqualification of the judge authoring this opinion, (b) a grievance requesting disciplinary action against the judge, and (c) a thirty-five-page, one-hundred-ninety-three paragraph federal civil rights complaint against the judge. After due consideration over several days by the respective authorities, Caron's filings were summarily dismissed as constituting frivolous filings.

The evidence demonstrates beyond reasonable doubt that for almost 5-½ years, until the day before the contempt hearing, the father failed to pay voluntarily any child support for his son, despite the fact the father earns his living as a professional engineer. The evidence shows that he has continuously ignored the orders of this court despite having been brought before it numerous times on contempt motions, and despite being found in contempt in February 1998, and ignoring the opportunity to purge himself of contempt for over two years. The father's claim of disestablishment of paternity will be ruled upon in accordance with law in a fair and objective manner, but until that issue is finally decided by the courts, he is fully expected to abide by all court orders, including those with which he disagrees, such as paying child support. *Gompers v. Buck's Stove, supra,* at 450, 31 S.Ct. at 501–502, 55 L.Ed. at 809; *Howat v. Kansas* (1922), 258 U.S. 181, 190, 42 S.Ct. 277, 281, 66 L.Ed. 550, 559.[5]

The court finds the father to be in civil contempt of court as of the day before the contempt hearing, sentences him to thirty days in jail, and finds that he has purged himself by making his lump-sum delinquent payment on the day before the contempt hearing. The court deems the contemnor's belated payment of his arrearages to be a masquerade because he contemplated the recapture of most of it under his settlement proposal. Even if it were not a contrived payment, however, it does not divest this court of its contempt power, and contempt sanctions of imprisonment and fine may be imposed to uphold the dignity of the court even though all child support arrearages have been paid

---

5. No appeal was taken from this court order. Three weeks after rendering this decision, the court dismissed the father's parentage action upon the basis of res judicata in the companion *domestic relations* case.

before the contempt hearing, and certainly would be justified under the circumstances of this case. *Roach v. Roach, supra,* at 323, 572 N.E.2d at 776–777; *Morford v. Morford, supra,* at 55, 619 N.E.2d at 74; *Walton v. Davis* (June 26, 1997), Franklin App. No. 96APF11–1503, unreported, 1997 WL 358860. The court nevertheless exercises its discretion to suspend this contempt incarceration sanction.

 The court further finds the father to be in criminal contempt of court immediately before his forced payment of child support, and sentences him to thirty days in jail with his sentence to begin immediately. *"All those who would by misconduct obstruct the administration of justice must be on notice that they do so at their peril."* (Emphasis added.) *State v. Union, supra,* at 90, 15 O.O.2d at 142, 173 N.E.2d at 342. *"The courts of justice must not be deflected or interfered with. Those who strike at it, strike at the very foundation of our society."* *Morris v. Crown Office, supra,* at 2 Q.B. 114, 122, and 1 All E.R. 1079, 1081.

The court further orders contemnor Caron to forthwith reimburse the mother the attorney fees she expended in this contempt proceeding.

This opinion is rendered in the best interests of the child and the people of Ohio, with due process afforded the father. No party to litigation should be penalized for exercising his rights to the fullest extent of the legal remedies available, but *it is manifest that unless courts enforce their child support orders, the children of Ohio will suffer immeasurably, the public will justifiably lose all respect for and confidence in the law, and lawlessness will prevail in our society. This the courts of Ohio will not permit.*

So ordered.

*Judgment accordingly.*

WILLIAM F. CHINNOCK, J., retired, of the Cuyahoga County Juvenile Court, sitting by assignment.